# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JAN BRANSON, individually as heir-at-law and as Special Administrator of the Estate of Matthew C. Oliva, et al.. | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | )   Case 25-cv-2025-KHV-ADM |
| v. | ) |
| | ) |
| BOARD OF COUNTY COMMISSIONERS, SHAWNEE COUNTY, KANSAS d/b/a Shawnee County Adult Detention Center, et al. | ) ) ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, by and through their counsel, and for their First Amended Complaint against Defendants state as follows:

## INTRODUCTION

This is an action for monetary damages against Defendants for negligence and violations of Plaintiffs' constitutionally protected rights and for rights protected under the laws of the State of Kansas.

## PARTIES

### *Plaintiffs*

1.      Plaintiffs Jan Branson and James ("Jim") Oliva are the surviving parents of Matthew Oliva ("Decedent"). Plaintiff Bradford Oliva is the surviving brother of Decedent (collectively referred to as "Plaintiffs"). Matthew Oliva, deceased, (hereinafter "Decedent") was a citizen of the United States and a resident of Topeka, Kansas. Plaintiff Jan Branson has been appointed Administrator of the Estate of Matthew Oliva.

1

### *Shawnee County*

2.      Defendant Board of County Commissioners Shawnee County, Kansas, d/b/a Shawnee County Adult Detention Center (hereinafter "Shawnee County" or "Shawnee County ADC"), is a governmental body and subdivision of the State of Kansas, and may be served with process by serving Cyndi Beck, as Shawnee County Clerk and by serving Kevin Cook as Shawnee County Commissioner – Chair at the Shawnee County Commission Office, 707 SE Quincy Street, Topeka, KS 66603.

3.      At all times material hereto, a custodial relationship existed between Defendant Shawnee County ADC and Decedent, Matthew Oliva, by virtue of him being detained as an inmate at Defendant Shawnee County ADC.[1]

4.      At all times material hereto, Defendant Shawnee County ADC held a duty to protect detained inmates from unreasonable risk of harm and provide reasonable aid for the health, welfare, and safety of inmates, including Decedent, Matthew Oliva.

5.      At all times material hereto, Defendant Shawnee County ADC was acting under color of state law.

6.      On February 15, 2022, the Shawnee County Department of Corrections issued Request for Quotes #011-22 for Comprehensive Mental and Physical Health Care Services for Shawnee County Department of Corrections, Adult and Juvenile Detention Center Residents. The Shawnee County Bid Requests database states this contract was awarded to Armor Correctional Health Services.

---

[1] Defendants' policies refer to all individuals in their custody as "inmates," regardless of their pre-trial or post-conviction status. Although Decedent was technically a pre-trial detainee, he is referred to as both a detainee and inmate for purposes of Defendants' policies. The due process rights of pre-trial detainees are at least as great as the Eighth Amendment protections afforded to convicted prisoners. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983). Accordingly, the duty and standard of care owed to Decedent is the same regardless of whether he is classified as a detainee or inmate.

2

*Armor Health of Shawnee County, LLC*

7.      Defendant Armor Health of Shawnee County, LLC, is a foreign limited liability company which conduct business within the State of Kansas with a current mailing address of 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155. Process and service of process is requested upon Defendant Armor Health of Shawnee County, LLC by serving its registered agent, Otto Campo, at 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155.

8.      Defendant Armor Health of Shawnee County is not registered to do business in the State of Kansas.

9.      Armor Health of Shawnee County, LLC was organized in the State of Florida on March 14, 2022. The Operating Agreement provides as follows:

   a.   Armor Health of Shawnee County is a manager managed LLC with the sole manager being Otto Campo;

   b.   Armor Health of Shawnee County has a sole member, Armor Correctional Healthcare Holdings, Inc.; and

   c.   Armor Health of Shawnee County is to "be disregarded as an entity such that the assets, liabilities, income and expenses of the Company [Armor Health of Shawnee County] shall be treated (for income tax purposes only) as the assets, liabilities, income and expenses of the Member [Armor Correctional Healthcare Holdings, Inc.]."

10.     Pursuant to the Declaration of Otto Campo In Support of Armor Health Holdings, LLC's Motion to Dismiss (Doc #32-1), filed March 21, 2025, and as referenced by this Court in its June 27, 2025 Memorandum and Order (ECF #69), Defendant Armor Health Holdings, LLC owns the equity in Armor Health of Shawnee County, LLC.

11.     At all times material hereto, Defendant Armor Health of Shawnee County is the named entity which contracted with the Shawnee County ADC to provide reasonably necessary healthcare, including medical and mental services to Shawnee County ADC detainees.

12.    At all times material hereto, Defendant Armor Health of Shawnee County's only contract and revenue source was with Shawnee County ADC.

13.    At all times material hereto, Defendant Armor Health of Shawnee County held itself out as offering that degree of medical care and treatment to inmates as other similar medical providers under the same or similar circumstances.

14.    At all times material hereto, a medical care provider/patient relationship existed between Decedent, Matthew Oliva, and Defendant Armor Health of Shawnee County.

15.    At all times material hereto, Defendant Armor Health of Shawnee  County owed Decedent a duty to practice medicine within the acceptable standard of care as other similar medical providers under the same or similar circumstances.

16.    At all times material hereto, Defendant Armor Health of Shawnee County was acting under color of state law.

### Armor Health Management, LLC f/k/a Armor Correctional Health Services Inc.

17.    Defendant Armor Health Management is a foreign limited liability company with a current mailing address of 4960 SW 72nd Ave., Ste. 400, Miami, Florida 33155. Process and service of process is requested upon Defendant Armor Health Management, LLC by serving its registered agent, CT Corporation System, 1200 South Pine Island Rd., Plantation, Florida 33324.

18.    Armor Health Management, LLC, formerly known as Armor Correctional Health Services, Inc., is a wholly owned subsidiary of Armor Health Holdings, LLC. Armor Correctional Health Services, Inc., is the entity which had been providing medical services to correctional facilities since 2004.

19.    Otto Campo is the Manager and CEO of Armor Health Management, LLC.

4

20.     At all times material hereto, Defendant Armor Health Management is the entity which solicited, was awarded, and secured a contract with the Shawnee County ADC to provide reasonably necessary healthcare, including medical and mental services to Shawnee County ADC detainees.

21.     At all times material hereto, Defendant Armor Health Management held itself out as offering that degree of medical care and treatment to inmates as other similar medical providers under the same or similar circumstances.

22.     At all times material hereto, a medical care provider/patient relationship existed between Decedent, Matthew Oliva, and Defendant Armor Health Management.

23.     At all times material hereto, Defendant Armor Health Management owed Decedent a duty to practice medicine within the acceptable standard of care as other similar medical providers under the same or similar circumstances.

24.     At all times material hereto, Defendant Armor Health Management was acting under color of state law.

25.     In late 2021, Armor Correctional Healthcare Services, Inc., began a drastic corporate restructuring amid both pending civil litigation and Armor Correctional Healthcare Services, Inc., facing criminal prosecution in Wisconsin for falsified medical records. Armor Correctional Healthcare Services, Inc., was found guilty and convicted of a felony, to which Armor Correctional Healthcare Services admitted to in a separate wrongful death trial in Florida.

26.     On November 21, 2021, Armor Correctional Health Services, Inc., filed a notice of becoming inactive. That same day, Articles of Organization were filed for Armor Health Management, LLC, as well as Articles of Conversion for Armor Correctional Healthcare Services, Inc., converting all of its shares to Armor Health Management, LLC.

27.     Armor Health Management, LLC contracted with other Armor subsidiaries, such as Armor Health of Shawnee County, to provide managerial and operational support for the day-to-day operations of Armor subsidiaries. At all times relevant hereto, such support includes, but is not limited to, providing policies and procedures, payroll functions, accounting and finance, human resources, vendor agreements, risk management and compliance oversight, and other administrative support.

28.     As of October 31, 2024, Armor Health Management was due $66,729,121.39 from intercompany receivables, which solely comes from the contracts with Armor subsidiaries to provide managerial and operational support. Armor Health of Shawnee County owed Armor Health Management $1,714,293.47 for these services.

29.     At all times relevant, Armor Health Management, LLC, demonstrated such domination of finances, policy, and practices over Armor Health of Shawnee County that Armor Health of Shawnee County had no separate mind, will, or existence of its own.

### *Enhanced Management Services, LLC*

30.     Defendant Enhanced Management Services, LLC is a Foreign limited liability company with a current mailing address of 4960 SW 72nd Ave., Suite 209, Miami, Florida 33155. Process and service of process is requested upon Defendant Armor Correctional Healthcare Holdings, Inc., by serving its registered agent, Lissette Perez at 4960 SW 72nd Ave., Suite 209, Miami, Florida 33155.

31.     Jose Armas is the sole owner of Enhanced Management Services, LLC.

32.     Enhanced Management Services, LLC was organized on August 29, 2023. The Manager is Manuel Fernandez, who also serves as the COO of Armor Health Management, LLC.

33.     Manuel Fernandez is also the individual who signed the Health Services Agreement on behalf of Armor Health of Shawnee County with Shawnee County Department of Corrections.

34.     On October 11, 2023, a Petition Commencing Assignment for the Benefit of Creditors of the Estate of Armor Health Management, LLC, was filed in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. (Case No. 2023-024558-CA-01) (hereinafter the "Assignment Proceedings"). The Assignment Proceedings arose from Armor Health Management's over $150 million in unsecured debt, including obligations from lawsuits and unpaid services.

35.     These proceedings are why Defendant Armor Health Management filed a Suggestion of Assignment for Benefit of Creditors in this case, on June 18, 2025. (ECF #64-65).

36.     On February 27, 2025, the Court in the Assignment Proceedings approved Defendant Armor Health Management's sale of assets to Enhanced Management Services, LLC.

37.     As part of the sale of assets, numerous "Special Purpose Entities," ("SPEs") which are the Armor subsidiary entities whose sole purpose is to contract with  specific correctional centers and/or governing bodies (ie, Armor Health of Shawnee County), were to be assumed by Enhanced Management Services, LLC., including the assets and liabilities of each SPE.

38.     As indicated by, the Court in the Assignment Proceedings "the only assets of real value being held by the SPEs are contracts to provide services to correctional facilities."

39.     Within the Assignment Proceedings there are allegations raised by the Assignee, Daniel Stermer, against the Armor entities, including Jose Armas and Otto Campo, which are particularly prevalent to Plaintiffs' claims herein. Such claims include as follows:

   a.    "The Potential Claims that are proposed to be settled under the terms of the Settlement Agreement principally arise out of (i) the transfer of monies from Armor Health to Armas and Campo over a period of four years, which monies totaled several million dollars, and (ii) the transfer or contracts (as well as the corporate

7

opportunity to enter into future contracts) from Armor Health to the SPEs, including as a result of the Restructuring (as defined below)."

b.  "The Assignee has asserted that certain monies transferred and/or paid to Armas and Campo during the four years prior to the Assignment Cases constitute fraudulent transfers…"

c.  "In addition, in or around the last half of 2021, Armor Health underwent a corporate restructuring (the "Restructuring") wherein Armor Health Holdings, LLC ("Armor Holdings") was formed, with an effective date of January 1, 2022, to function as a holding company for Armor Health and the SPEs, which were also created in connection with Restructuring. On January 1, 2022, all membership interests in Armor Health, along with the membership interests in the SPEs, were transferred to Armor Holdings. Campo is the Manager and CEO of Armor Holdings."

d.  "On January 2, 2022, all the Class A Membership Interests in Armor Holdings were issued to Armor Correctional Healthcare Holdings, Inc ('Armor Correctional Healthcare'). A Florida formed corporation incorporated on October 28, 2019. On January 2, 2022, Armor Correctional Holdings assigned 0.5% of its Class A Membership Interests in Armor Holdings to Armas. Campo is the President and Director of Armor Correctional Healthcare and Lissette Perez is its Secretary."

e.  On January 3, 2022, all the Class B Membership Interests in Armor Holdings were assigned to Campo. Exhibit A of the Armor Holdings Operating Agreement outlines the structure of Armor Holding's membership interests as follows:"

**EXHIBIT A**

**Class A Members**

| Name | Percentage Interest | Profits Interest |
|---|---|---|
| Armor Correctional Healthcare Holdings, Inc. | 99.50% | 49.75% |
| Jose J. Armas | 0.50% | 0.25% |

**Class B Members**

| Name | Percentage Interest | Profits Interest |
|---|---|---|
| Otto Campo | - | 50.00% |

f.  "After the Restructuring, the corporate structure of Armor Health and its affiliates was as follows, which structure existed as of the filing of the Assignment Cases[2]:"

---

[2] Upon information and belief the same corporate structure existed at all times material hereto.



g. "Each of the SPEs was a party or otherwise involved with a corporate Restructuring of Armor Health and Armor Correctional, pursuant to which, among other things, Armor Health transferred certain of its contracts to one or more of the SPEs and/or one or more of the SPEs entered into new contracts with governmental entities as opposed to and in lieu of Armor Health. Upon information and belief, the SPEs did not pay anything to Armor Health for the assignment of such contracts or the right to pursue any such corporate opportunities."

h. "[t]he transfer of the contracts with correctional facilities by Armor Health to the SPEs in connection with the Restructuring, as well as the fact that certain of the SPEs entered into new contracts with certain correctional facilities, constituted fraudulent transfers…"

i. "[c]ertain Potential Claims exist in favor of the Assignment Estates against one or more of the Armas Parties, including, without limitation and for illustrative purposes only, for fraudulent transfers, breach of fiduciary duty, successor liability, *de fact* merger and/or mere continuation."

40.     The settlement agreement with the Assignee in the Assignment Proceedings was for a total value of $2,000,000, for which Jose Armas, Otto Campo, Armor Health Holdings, Armor Correctional Healthcare Holdings, and the SPEs, were jointly and severally liable.

41.     As part of this settlement agreement, the Assignee has a first priority lien and security interest in and to all of the assets owned by each SPE, including Armor Health of Shawnee County. Thus, if Armas, Campo, and/or the Armor Holding companies do not make the payments

required under the settlement agreement, the Assignee will have a first priority lien on any and all assets of Armor Health of Shawnee County.

42.     Enhanced Management Services, LLC now serves as the entity which contracts with Armor Health of Shawnee County to provide managerial and operational support for the day-today operations of Armor subsidiaries. Such support includes, but is not limited to, providing policies and procedures, payroll functions, accounting and finance, human resources, vendor agreements, risk management and compliance oversight, and other administrative support.

43.     Enhanced Management Services is the successor to Armor Health Management, LLC because it is a mere continuation of Armor Health Management's business.

44.     Enhanced Management Services is under the same ownership as Armor Health Management, uses the same executives as Armor Health Management, uses the same building as Armor Health Management, and employs the same policies, procedures, and administrative functions as Armor Health Management did to the Armor SPEs. In short, the only thing that has changed is the name of the business.

### *Armor Health Holdings, LLC*

45.     Defendant Armor Health Holdings is a foreign limited liability company with a principal address of 4960 SW 72nd Ave., Ste. 400, Miami, Florida 33155. Process and service of process is requested upon Defendant Armor Health Holdings, LLC by serving its registered agent, Otto Campo at 4960 SW 72nd Ave., Suite 406, Miami, Florida 33155.

46.     On November 24, 2021, Articles of Organization were filed for Armor Health Holdings, LLC, with an effective date of January 1, 2022.

47.     Armor Health Holdings, LLC is a manager-managed LLC with Otto Campo being the sole manager. Otto Campo also serves as the CEO of Armor Health Holdings, LLC.

48.     On January 1, 2022, all membership interests in Armor Health Management, LLC, along with the membership interests in the Special Purpose Entities, were transferred to Armor Health Holdings, LLC. Defendant Armor Health Holdings, LLC owns the equity in Armor Health of Shawnee County and Armor Health Management.

49.     Armor Health Holdings, LLC has three members, two Class A Members and one Class B Member. Armor Correctional Healthcare Holdings is a Class A Member with a 99.5% Ownership Interest and a 49.75% Profit Interest. Jose Armas is a Class A Member with a 0.50% Ownership Interest and a 0.25% Profits Interest. Otto Campo is a Class B Member with a 50.00% Profits Interest.

50.     Under the Health Services Agreement between Armor Health of Shawnee County and Shawnee County Detention Center, that was awarded to and secured by Armor Health Management, Armor Health of Shawnee County was required to maintain professional liability insurance in the minimum amount of at least $5,000,000.00. Armor Health Holdings, LLC is the named insured on the insurance policy covering the claims at issue in this lawsuit.

51.     At all times relevant, Armor Health Holdings, LLC, by and through its wholly owned subsidiary Armor Health Management, controls the day-to-day operations of Armor Health of Shawnee County and other SPEs by providing policies and procedures, payroll functions, accounting and finance, human resources, vendor agreements, risk management and compliance oversight, and other administrative support.

52.     As of October 31, 2024, Armor Health Holdings was due $465,105.18 from Armor Health Management, LLC for those services pertaining to the control of the day-to-day operations of Armor Health of Shawnee County.

53.     At all times relevant, Armor Health Holdings, LLC, demonstrated such domination of finances, policy, and practices over Armor Health Management and Armor Health of Shawnee County that neither of these entities had a separate mind, will, or existence of its own.

### *Armor Correctional Healthcare Holdings, Inc.*

54.     Defendant Armor Correctional Healthcare Holdings, Inc., is a Florida for profit corporation with a current mailing address of 4960 SW 72nd Ave., Suite 400, Miami, Florida 33155. Process and service of process is requested upon Defendant Armor Correctional Healthcare Holdings, Inc., by serving its registered agent, Otto Campo at 4960 SW 72nd Ave., Suite 406, Miami, Florida 33155.

55.     Armor Correctional Healthcare Holdings, Inc., was incorporated on October 28, 2019, by Eduardo Bertran.[3] The Articles of Incorporation list three Directors – Eduardo Bertran, Otto Campo, and Thomas Dave.

56.     Armor Correctional Healthcare Holdings, Inc. holds a 99.5% Class A Membership Interest in Armor Health Holdings, LLC, entitling it to a 49.75% profits interest. Armor Health Holdings, LLC owns 100% of Armor Health Management, LLC and, Armor Health of Shawnee County, LLC. Consequently, Armor Correctional Healthcare Holdings indirectly owns substantially all of Armor Health of Shawnee County and Armor Health Management.

57.     Otto Campo is the CEO, President and Director of Armor Correctional Healthcare Holdings, Inc.

58.     Armor Correctional Healthcare Holdings, Inc., by and through its wholly owned subsidiary Armor Health Management, controls the day-to-day operations of Armor Health of

---

[3] Eduardo Bertran is a partner of the firm defending the Armor entities in this action, Armas Bertran Pieri, with a listed address of 4960 SW 72nd Ave., Suite 206, Miami, Florida 33155. Bertran's law partner is Alfredo Armas, the brother of Jose Armas, owner of the Armor entities.

Shawnee County and other SPEs by providing policies and procedures, payroll functions, accounting and finance, human resources, vendor agreements, risk management and compliance oversight, and other administrative support

59.     As of October 31, 2024, Armor Correctional Healthcare Holdings, Inc., was due $109,540,035.82 from Armor Health Management in intercompany payables. Upon information and belief these include those from Armor Health of Shawnee County.

60.     At all times relevant, Armor Correctional Healthcare Holdings, LLC, demonstrated such domination of finances, policy, and practices over Armor Health Holdings, Armor Health Management and Armor Health of Shawnee County that none of these entities had a separate mind, will, or existence of their own.

### *Otto Campo*

61.     Defendant Otto Campo is the CEO, President, Director, Manager, Registered Agent, and/or Member of all aforementioned and other existing Armor entities. Process and service of process is requested upon Otto Campo by serving him personally at his residential address of 7360 SW 164th Street, Palmetto Bay, Florida 33157.

62.     Otto Campo is the longtime CEO of Armor Correctional Health Services, Inc., n/k/a Armor Health Management, Armor Health Holdings, Armor Correctional Healthcare Holdings, Inc., and sole manager of Armor Health of Shawnee County.

63.     Otto Campo owns 50% Profits Interest in Armor Health Holdings, which entitles him to 50% of profits from Armor Health of Shawnee County and Armor Health Management.

64.     Otto Campo directly benefits from the financial transfers and distributions of Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings and Armor

Correctional Healthcare Holdings. As of October 31, 2024, Armor Health Management's[4] balance sheet shows significant shareholder distributions, including $2,405,000.00 in amounts due to shareholders and dividends paid totaling $15,908,560.73. These distributions indicate that Otto Campo and Jose Armas extract substantial funds from the holding companies for personal benefit, further evidencing the lack of corporate separateness.

65.    Otto Campo has deliberately structured the Armor entities to perpetuate fraud or injustice by reaping the financial benefits of siphoning each entity's funds into one holding company for which he is a manager, director and/or member of, while attempting to evade accountability and liabilities through fictitious legal boundaries.

66.    Otto Campo exhibits such domination of finances, policy, and practices of Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, and Armor Correctional Healthcare Holdings, such that none of these entities have a separate mind, will, or existence of their own.

### Jose Armas

67.    Defendant Jose Armas is the owner of the aforementioned Armor Defendants, as well as Defendant Enhanced Management Services. Process and service of process is requested upon Otto Campo by serving him personally at his residential address of 225 Arvida Pkwy, Coral Gables, Florida 33156.

68.    Jose Armas is the owner of Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, and/or Armor Correctional Healthcare Holdings, Inc.

69.    Jose Armas directly benefits from the financial transfers and distributions of Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings and Armor

---

[4] Despite now being known as Armor Health Management, LLC, a plethora of Armor documents, including the balance sheet referenced here, are labeled as or contain the entity name Armor Correctional Healthcare, Inc.

Correctional Healthcare Holdings. As of October 31, 2024, Armor Correctional Health Services, Inc.'s balance sheet shows significant shareholder distributions, including $2,405,000.00 in amounts due to shareholders and dividends paid totaling $15,908,560.73. These distributions indicate that Otto Campo and Jose Armas extract substantial funds from the holding companies for personal benefit, further evidencing the lack of corporate separateness.

70.    Jose Armas has deliberately structured the Armor entities to perpetuate fraud or injustice by reaping the financial benefits of siphoning each entity's funds into one holding company for which he is an owner, while attempting to evade accountability and liabilities through fictitious legal boundaries.

71.    Jose Armas exhibits such domination of finances, policy, and practices of Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, and Armor Correctional Healthcare Holdings, such that these entities have no separate mind, will, or existence of their own.

### *Dr. Mariana Mack*

72.    Defendant Mariana Mack, M.D., is a psychiatrist licensed to and practicing medicine in the State of Kansas with a current and correct residential address of 7904 W. 130th St., Overland Park, Kansas 66213. Process and service of process is requested upon said Defendant by serving her at the above stated address.

73.    At all material times hereto, Defendant Mariana Mack, M.D., was a psychiatrist at the Shawnee County Adult Detention Center. Defendant Mack participated personally in the acts and omissions giving rise to this suit.

74.    Upon information and belief, at all times material hereto, Defendant Mack was not employed by Defendant Armor Health of Shawnee County.

75. At all times material hereto, Defendant Mariana Mack, M.D., held herself out as offering that degree of medical care and treatment as other psychiatrists with the same or similar training under the same or similar circumstances.

76. At all times material hereto, a physician-patient relationship existed between Decedent and Defendant Mariana Mack, M.D.

77. At all times material hereto, Defendant Mariana Mack, M.D., owed Decedent a duty to practice medicine within the acceptable standard of care as other similar healthcare providers under the same or similar circumstances.

78. At all times material hereto, Defendant Mariana Mack, M.D., was acting under color of state law.

### *Health Services Liaison Heather Willier*

79. Defendant Heather Willier was at all times relevant hereto, the Health Services Liaison with the Shawnee County ADC with a current address of 410 Kansas Ave., Alma, Kansas 66401. Process and service of process is requested upon said Defendant by serving her at the above stated address.

80. Defendant Willier participated personally in the acts and omissions giving rise to this suit. She knew and disregarded an excessive risk to Decedent's health and safety. She also knew or reasonably should have known, in her supervisory role, of acts committed by her subordinates that were depriving Decedent of his constitutional rights while he was a detainee at Shawnee County ADC.

81. At all times material hereto, Defendant Willier was responsible for medical policies and procedures at the Shawnee County ADC and held governing authority for the provision of healthcare services thereto. Defendant Willier – as a policy making official – knew, adopted and

16

did nothing to end the unconstitutional policies and practices that were so well-settled as to constitute policies at Shawnee County ADC.

82.    At all times material hereto, Defendant Willier was acting under the color of state law.

### *Health Services Administrator Maggie Moore*

83.    Defendant Margaret ("Maggie") Moore was at all times relevant hereto, the Health Services Administrator for Defendant Armor at the Shawnee County ADC with a current residential address of 10933 Pine Circle, Ozawkie, Kansas 66070. That process and service of process is requested upon said Defendant by serving her at the above stated address.

84.    Defendant Moore participated personally in the acts and omissions giving rise to this suit. She knew and disregarded an excessive risk to Decedent's health and safety. She also knew or reasonably should have known, in her supervisory role, of acts committed by her subordinates that were depriving Decedent of his constitutional rights while he was a detainee at Shawnee County ADC.

85.    At all times material hereto, Defendant Moore was responsible for medical policies and procedures at the Shawnee County ADC and held governing authority for the provision of healthcare services thereto. Defendant Moore – as a policy making official – knew, adopted and did nothing to end the unconstitutional policies and practices that were so well-settled as to constitute policies at Shawnee County ADC.

86.    At all times material hereto, Defendant Maggie Moore was acting under the color of state law.

### *Behavioral Health Director Emily Foster*

87.     Defendant Emily Foster was at all times relevant hereto, the Behavioral Health Director for Defendant Armor at the Shawnee County ADC with a current residential address of 17480 188th Ter., Tonganoxie, Kansas 66086. Process and service of process is requested upon said Defendant by serving her at the above stated address.

88.     Defendant Foster participated personally in the acts and omissions giving rise to this suit. She knew and disregarded an excessive risk to Decedent's health and safety. She also knew or reasonably should have known, in her supervisory role, of acts committed by her subordinates that were depriving Decedent of his constitutional rights while he was a detainee at Shawnee County ADC.

89.     At all times material hereto, Defendant Foster was responsible for mental/behavioral health policies and procedures at the Shawnee County ADC and held governing authority for the provision of medical and treatment services thereto. Defendant Foster – as a policy making official – knew, adopted and did nothing to end the unconstitutional policies and practices that were so well-settled as to constitute policies at Shawnee County ADC.

90.     At all times material hereto, Defendant Emily Foster was acting under the color of state law.

### *Nurse Heidi White*

91.     Defendant Heidi White, RN ("Nurse White" or "Defendant White"), was at all times relevant hereto, a registered nurse for Defendant Armor at the Shawnee County ADC with a current residential address of 2016 S.W. 70th Ter., Topeka, Kansas 66619. Process and service of process is requested upon said Defendant by serving her at the above stated address. Defendant White participated personally in the acts and omissions giving rise to this suit.

92.    At all times material hereto, Defendant White was an employee and/or agent of Defendant Armor, who was, in part, responsible for overseeing Decedent's health and well-being, and assuring that Decedent's medical and mental health needs were met, during the time he was in the custody of Shawnee County ADC. Nurse White is being sued in her individual capacity.

### Nurse Kimberly Claflin

93.    Defendant Kimberly Claflin, RN ("Nurse Claflin" or "Defendant Claflin"), was at all times relevant hereto, a registered nurse for Defendant Armor at the Shawnee County ADC with a current residential address of 903 E. Steadman St., Anthony, Kansas 67003. That process and service of process is requested upon said Defendant by serving her at the above stated address. Defendant Claflin participated personally in the acts and omissions giving rise to this suit.

94.    At all times material hereto, Defendant Claflin was an employee and/or agent of Defendant Armor, who was, in part, responsible for overseeing Decedent's health and well-being, and assuring that Decedent's medical and mental health needs were met, during the time he was in the custody of Shawnee County ADC. Nurse Claflin is being sued in her individual capacity.

95.    Defendant Claflin received a formal offer of employment and was hired by Defendant Armor Health Management.

### Nurse Dawn Siler

96.    Defendant Dawn Siler, RN ("Nurse Siler" or "Defendant Siler"), was at all times relevant hereto, a registered nurse for Defendant Armor at the Shawnee County ADC with a current residential address of 1051 Allview Ave., El Sobrante, California 94803. Process and service of process is requested upon said Defendant by serving her at the above stated address. Defendant Siler participated personally in the acts and omissions giving rise to this suit.

97.     At all times material hereto, Defendant Siler was an employee and/or agent of Defendant Armor, who was, in part, responsible for overseeing Decedent's health and well-being, and assuring that Decedent's medical and mental health needs were met, during the time he was in the custody of Shawnee County ADC. Nurse Siler is being sued in her individual capacity.

98.     Defendant Siler received a formal offer of employment and was hired by Defendant Armor Health Management.

### Psych Tech Cassandra Gumbel

99.     Defendant Cassandra Gumbel, Psych Tech (PT) ("PT Gumbel" or "Defendant Gumbel"), was at all times relevant hereto, a psychiatric technician for Defendant Armor at the Shawnee County ADC with a current residential address of 8806 Hickory Ln., Ozawkie, Kansas 66070. That process and service of process is requested upon said Defendant by serving her at the above stated address. Defendant Gumbel participated personally in the acts and omissions giving rise to this suit.

100.    At all times material hereto, Defendant Gumbel was an employee and/or agent of Defendant Armor, who was, in part, responsible for overseeing Decedent's health and well-being, and assuring that Decedent's medical and mental health needs were met, during the time he was in the custody of Shawnee county ADC. PT Gumbel is being sued in her individual capacity.

### Behavioral Health Provider Cami Cocke

101.    Defendant Cami Cocke, Behavioral Health Provider (BHP) ("BHP Cocke" or "Defendant Cocke"), was at all times relevant hereto, a Licensed Clinical Professional Counselor for Defendant Armor at the Shawnee County ADC with a current residential address of 1145 S.W. High Ave., Topeka, Kansas 66604. That process and service of process is requested upon said

Defendant by serving her at the above stated address. Defendant Cocke participated personally in the acts and omissions giving rise to this suit.

102.    At all times material hereto, Defendant Cocke was an employee and/or agent of Defendant Armor, who was, in part, responsible for overseeing Decedent's health and well-being, and assuring that Decedent's medical and mental health needs were met, during the time he was in the custody of Shawnee County ADC. BHP Cocke is being sued in her individual capacity.

103.    Defendant Cocke received a formal offer of employment and was hired by Defendant Armor Health Management.

### Nurse Samantha Ritchie

104.    Defendant Samantha Ritchie, RN ("Nurse Ritchie" or "Defendant Ritchie"), was at all times relevant hereto, a registered nurse for Defendant Armor at the Shawnee County ADC with a current residential address of 515 Wheeler Ave., Alma, Kansas 66401. Process and service of process is requested upon said Defendant by serving her at the above stated address. Defendant Siler participated personally in the acts and omissions giving rise to this suit.

105.    At all times material hereto, Defendant Ritchie was an employee and/or agent of Defendant Armor, who was, in part, responsible for overseeing Decedent's health and well-being, and assuring that Decedent's medical and mental health needs were met, during the time he was in the custody of Shawnee County ADC. Nurse Ritchie is being sued in her individual capacity.

### Sergeant Shannon Addington

106.    Defendant Sergeant Shannon Addington ("Sgt. Addington" or "Defendant Addington"), was at all times relevant hereto, acting under color of state law as an employee of Shawnee County ADC with a current residential address of 514 S. 9th St., Osage City, Kansas 66523. That process and service of process is requested upon said Defendant by serving her at the

above stated address. Defendant Addington participated personally in the acts and omissions giving rise to this suit.

107.    At all times material hereto, Defendant Addington was, in part, responsible for overseeing Decedent's security, health and well-being, and assuring that Decedent's medical and mental health needs were met, during the time he was in the custody of Shawnee County ADC. Sgt. Addington is being sued in her individual capacity.

108.    At the time of the acts and occurrences complained of herein and at all times mentioned, Defendant Shawnee County and Defendant Armor were acting by and through their actual, ostensible, or apparent agents and employees, including but not limited to their officers and/or health care providers, in handling and providing medical care and treatment to Decedent.

109.    At the time of the acts and occurrences complained of herein and at all times mentioned, the actual, ostensible, and apparent agents of Defendant Shawnee County and Defendant Armor, including but not limited to their officers and/or healthcare providers, were acting within the course and scope of employment and/or agency in handling and providing medical care and treatment to Decedent.

## SUBJECT MATTER JURISDICTION

110.    This Court has jurisdiction over this matter under 28 U.S.C. § 1331, 28 § U.S.C. 1332, and 28 U.S.C. § 1343, as Plaintiff claims deprivation of constitutional and other rights brought pursuant to 42 U.S.C. § 1983. In addition, under 28 U.S.C. § 1367, this Court has jurisdiction over Plaintiff's state law claims which are so related to each other and to the federal claims herein pleaded that they form part of the same case or controversy under Article III of the United States Constitution.

## PERSONAL JURISDICTION

111.    There are sufficient grounds to disregard the legal fiction of corporate separateness between Armor Health of Shawnee County, Armor Health Management f/k/a Armor Correctional Healthcare Services, Inc., Armor Health Holdings, Armor Correctional Healthcare Holdings, Otto Campo, and Jose Armas ("Armor Defendants"), as alter egos of one another.

112.    The Armor Defendants are under common control and ownership, act in concert, and are not duly distinct or independent from one another.

113.    Armor Health of Shawnee County is not a viable corporation and is being used by Armor Health Holdings, Armor Correctional Healthcare Holdings, Campo, and Armas as a shield to evade liability of the SPEs which actually provide medical care.

114.    Otto Campo and Jesus Armas are the owners and/or members of Armor Health Holdings and Armor Correctional Healthcare Holdings.

115.    Armor Health Holdings and/or Armor Correctional Healthcare Holdings are the sole owners of Armor Health of Shawnee County and Armor Health Management.

116.    Furthermore, Armor Health Management f/k/a Armor Correctional Health Services possesses such domination of finances, policy, and practices of Armor Health of Shawnee County such that Armor Health of Shawnee County has no separate mind, will, or existence of its own.

117.    Armor Health Management, Armor Health Holdings, and/or Armor Correctional Healthcare Holdings deliberately targeted Kansas as a venue for the provision of mental and medical care at Kansas correctional facilities.

118.    Armor Health Management, Armor Health Holdings, and Armor Correctional Healthcare Holdings, directly and indirectly through Armor Health of Shawnee County, transacted business in Kansas.

*Armor Health Management's Technical Proposal to Contract with Shawnee County DOC*

119.    On February 15, 2022, Shawnee County Department of Corrections issued a Request for Quotes for comprehensive mental and physical healthcare services for detainees at its jail.

120.    On April 19, 2022, Armor Health Management f/k/a Armor Correctional Healthcare Services, submitted a Technical Proposal in response to Shawnee County Department of Corrections Request for these services.

121.    The proposal states, "Armor is registered to do business in the State of Kansas. Please see Appendix H for Armor's[5] Secretary of State Certificate of Good Standing."[6]

122.    In the proposal, the balance sheet provided to show Armor's financials was for Armor Health Management.

123.    The Letters of Intent from subcontractors in the proposal were addressed solely to Armor Health Management.

124.    The signature sheet in the proposal was signed by three Armor Health Management employees – Otto Campo (CEO), Manuel Fernandez (COO), and Denise Rupp (Senior Director of Business Development).

125.    The County awarded the contract to Armor Health Management.

126.    The contract for mental and physical health services for detainees of Shawnee County Department of Corrections was solicited by, secured by, and awarded to Armor Health Management.

---

[5] Referring to Armor Health Management.
[6] Armor Health of Shawnee County has never been in good standing or registered to do business in Kansas.

### Shared Officers

127.    Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, and/or Armor Correctional Healthcare Holdings share numerous owners, executives and officers amongst themselves. Including, but not limited to:

a.  Jose Armas – controlling owner of all Armor entities;

b.  Otto Campo – serves as CEO of Armor Health Management, Armor Health Holdings, Armor Correctional Healthcare Holdings, and as manager and registered agent of each SPE

c.  Manuel Fernandez – serves as COO of Armor Health Management, signed the Health Services Agreement with Shawnee County ADC, on behalf of Armor Health of Shawnee County, and is now the authorized agent and COO of Enhanced Management Services (discussed below)

d.  Lissette Perez – serves as Senior Vice President of Finance and Controller for Armor Health. She is also the registered agent for Enhanced Management Services;

e.  Mariloly Muller – serves as the Executive Vice president of Health Services and Chief Nursing Officer of Armor Health. She was also identified as "Armor Health of Shawnee County, Senior Leadership" in Armor Health of Shawnee County's Rule 26 Initial Disclosures;

f.  Jillian Lorenz– serves as the Director of CQI and Compliance for Armor Health. She was also identified as "Armor Health of Shawnee County, Regional Vice President" in Armor Health of Shawnee County's Rule 26 Initial Disclosure.

### Policies and Procedures of Armor Health Management

128.    Every policy and procedure produced in discovery to date by Defendant Armor Health of Shawnee County, LLC, is a policy or procedure provided by Armor Health Management, LLC, further evidencing that Armor Health of Shawnee County lacks independent operational authority and functions under the direct control and direction of its parent entities.

*Insurance Policy Covering This Claim*

129.    In their Rule 26 Initial Disclosures, Armor Health of Shawnee County produced an insurance policy which covers this claim. Armor Health Holdings, LLC was the named insured on the policy, covering the activity at the Shawnee County Department of Corrections.

130.    Armor Health Holdings deliberately entered into an insurance agreement with Armor Health of Shawnee County who conducts business solely in Kansas. As such, Armor Health Holdings assumed the risk of Armor Health of Shawnee County's activities in Kansas, and has purposefully availed itself to Kansas jurisdiction.

131.    Armor Health Holdings, Armor Correctional Healthcare Holdings, Armas, and Campo are subject to personal jurisdiction of this Court because of their intention restructuring of corporate entities to avoid liabilities by funneling assets through various subsidiaries, and rendering those subsidiaries, such as Armor Health of Shawnee County and Armor Health Management, insolvent and incapable of meeting their financial obligations in the event of a judgment or recovery against them.

132.    Armor Health Holdings and Armor Correctional Healthcare Holdings are further subject to personal jurisdiction of this Court because they exercise sufficient control over their subsidiaries Armor Health of Shawnee County and Armor Health Management.

133.    Because Armor Health Holdings and Armor Correctional Healthcare Holdings were transacting business through alter ego corporations in Armor Health Management and Armor Health of Shawnee County, each holding company is subject to jurisdiction in Kansas.

*Personal Jurisdiction of Armas, Campo, and Enhanced Management Services*

134.    Jose Armas and Otto Campo are subject to personal jurisdiction in Kansas based on alter ego liability and transacting business through various alter ego corporations in which their

sole purpose is to shield Armas and Campo from liability while enabling them to reap the financial benefits.

135.    Enhanced Management Services is subject to personal jurisdiction because it is the successor to Armor Health Management either as a de facto merger, a mere continuation of Armor Health Management's business, or the transfers and reorganization of Armor Health Management to Enhanced Management Services were done in a fraudulent effort to escape liability for Armor Health Management's debts, including this lawsuit.

136.    Furthermore, Enhanced Management Services is subject to personal jurisdiction of this Court because it has purposefully availed itself to Kansas by undertaking the management and oversight role of Armor Health of Shawnee County's day-to-day operations.

<u>**VENUE**</u>

137.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

<u>**FACTUAL ALLEGATIONS**</u>

**A.  Facts Applicable to All Defendants**

138.    Plaintiffs adopt and incorporate by reference all allegations contained in the above paragraphs as if fully set forth herein.

139.    Decedent was born on October 14, 1988, and died prematurely at the age of 35 years old on November 17, 2023.

140.    Decedent was a severely mentally ill man who suffered from Bipolar I disorder with psychotic features, which caused him to experience delusions, visual and auditory hallucinations, disordered thinking, and severe agitation. He suffered from bouts of psychosis and at times would completely lose touch with reality.

141.    Due to his psychoactive episodes, Decedent had a long history of hospitalizations, involuntary commitments to mental hospitals, and admissions to mental health treatment facilities – where he would be treated by a team of trained medical and mental health professionals. Once treated and stabilized, Decedent would return to the community.

142.    In addition to his severe mental health deficiencies, Decedent had a history of cellulitis in his lower left extremity.

143.    Decedent's mother, Plaintiff Jan Branson, was Decedent's court appointed legal guardian, responsible for all of Decedent's medical decision making, including the authority to admit Decedent to a mental health treatment facility pursuant to K.S.A. 59-3077, because Decedent lacked the mental capacity to make his own informed medical decisions.

### *October 22, 2023 – Arrest, Booking, Intake Screening*

144.    On October 22, 2023, at approximately 2:30 a.m., Decedent was suffering from an acute mental health crisis when he was arrested in Topeka, Kansas, and taken to the Shawnee County ADC.

145.    At the time he was arrested and detained, Decedent was a well-nourished, physically healthy and well-abled 35-year-old.

146.    Despite his dire need of urgent psychiatric and medical care, Decedent spent the next 14 days at the Shawnee County ADC alone in a segregation cell – in a state of active psychosis – before being transported to Stormont Vail Hospital with a number of significant medical issues including, but not limited to, severe sepsis, kidney failure, esophageal rupture, rhabdomyolysis, and cellulitis of his left lower extremity.

147.   On October 22, 2023, at approximately 3:50 a.m., Decedent was booked into Shawnee County ADC. Shawnee County staff knew Decedent was very mentally unstable and acutely psychotic from the time he entered the Shawnee County ADC.

148.   Armor Policy J-E-02 titled "Receiving Screening" defines "Medical clearance" as "A documented clinical assessment of medical, dental and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency room." That policy defines "Receiving screening" as "A process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment."

149.   Sections 1-3 "Procedure: Pre-Booking Screening" of Armor Policy J-E-02 titled "Receiving Screening" states: "When an arrestee arrives at the jail, a booking officer will make an immediate determination of the arrestee's condition to determine if immediate medical care is necessary…All information collected during the booking process will be provided to a qualified medical person for verification…Arrestees will be refused admission to the jail if medically unstable and sent to the hospital for evaluation and treatment."

150.   Section 11 "Procedure: Intake/Receiving Screening" of Armor Policy J-E-02 titled "Receiving Screening" states: "If the patient refuses to be screened or is "unscreenable" due to mental health or other conditions, he/she will be held in intake housing or medical observation until the screening can be completed. Nursing staff will conduct regular rounds – at least every two hours, on the patient until the screening can be completed…(d) If the patient is found to have altered mental status, regardless of the origin, and refuses intake, the patient will be sent for evaluation in the Emergency Department."

151.    Decedent's arresting officer requested he be evaluated given his observation of Decedent appearing "hyper" or "manic."

152.    Shortly after his arrival, Armor Nurse Kimberly Claflin asked Decedent pre-booking screening questions in the Sally Port. She described Decedent's behavior as bizarre, and she indicated he was either chemically impaired or he had a mental illness. Despite knowing Decedent was medically unstable, Nurse Claflin approved Decedent to continue with the booking process as opposed to sending him to the hospital for evaluation and treatment.

153.    At 4:50 a.m., approximately an hour after Decedent's arrival to Shawnee County ADC, the booking officer generated an officer's report in which he stated Decedent during previous detainment had been placed on suicide watch or close observation status, that Decedent suffers from mental health issues, and that Decedent had spent time in a mental health facility in the past.

154.    During the booking process, Decedent was listed as suffering from the following current medical conditions: psychological impairment, mental deficiency, and mental health issues. As a result, Decedent was recommended "maximum" custody level.

155.    While Decedent was in the booking area awaiting to be medically screened in by Armor staff, Nurse Claflin indicated she and Armor Nurse Dawn Siler would not be able to complete Decedent's medical screening. Nurse Siler believed Decedent would be unable to complete his screening due to his behavior, while Nurse Claflin believed attempting a medical screening would pose a safety concern for Armor staff.

156.    At 6:59 a.m., while still in the booking area awaiting to be medically screened in, Decedent was observed beating on his cell door and yelling. Decedent had also smeared his own feces over the walls of his cell and mattress. Despite Decedent's glaring severe mental health

deficiencies, Sergeant Shannon Addington called medical to inquire if there was any reason Decedent could not be placed in administrative segregation.

157.    At 7:16 a.m., Armor Nurse Heidi White completed Decedent's confinement clearance form in which she stated that Decedent had (1) "unknown" prior history of self-harm attempts, (2) no major mental illness such as schizophrenia, psychotic disorder, major depressive, bipolar, or schizoaffective disorder, and (3) no medical or mental health needs that contraindicated the medical clearance for confinement, despite the booking officer stating that Decedent (1) suffers from mental health issues, (2) had a history of being in mental health facilities, and (3) spent previous detainments on suicide watch.

158.    Despite Decedent not being medically screened, Defendant Heidi White placed Decedent on "screen pending" status and transferred him out of intake housing to a protrusion free segregation cell.

159.    Defendants Shannon Addington and Heidi White violated Armor Policy J-E-02-11 Procedure for Intake/Receiving Screening by transferring Decedent out of intake housing (or medical observation where nursing rounds were taking place every two hours) prior to Decedent's screening being completed.

160.    Defendants Kimberly Claflin, Dawn Siler and Heidi White violated Armor Policy J-E-02-11 Procedure for Intake/Receiving Screening by failing to have Decedent sent for evaluation in the Emergency Department despite his altered mental status when an intake had not been performed.

161.    Defendants Shannon Addington, Kimberly Claflin, Dawn Siler and Heidi White violated J-E-02-1-3 Procedure for Pre-Booking Screening" of Armor Policy J-E-02 by allowing

Decedent to be admitted to the jail instead of sending him to the hospital for evaluation and treatment due to his medical instability.

162.    Prior to being admitted to Shawnee County ADC, Decedent was not medically cleared in violation of Armor Policy J-E-02.

163.    Prior to being admitted to Shawnee County ADC, Decedent did not receive a receiving screening in violation of Armor Policy J-E-02.

164.    Once admitted to the jail, Decedent was deemed "screen pending." Armor policy J-E-02-11 Procedure for Intake/Receiving Screening requires nursing staff to conduct rounds every two (2) hours until the screening can be completed. Further, Procedure under Armor Policy J-G-02-2 titled "Patients in Restrictive Housing" requires Armor nursing staff to conduct daily rounds ("segregation rounds") on patients housed in restrictive housing areas, such as Decedent, during which Armor staff is required to observe and speak with the patient, give the patient the opportunity to request care and monitor each patient's general medical and behavioral health status. However, as will be detailed further below, Armor staff failed to follow these Armor policies and sometimes went entire days without attempting to screen Decedent.

165.    Decedent never completed his initial medical screening and remained on "screen pending" status in a segregation cell until he was transported out of the jail to Stormont Vail Hospital on November 5, 2023.

166.    These policy violations were widespread and have occurred with prior mentally ill detainees at Shawnee County ADC resulting in death, like Decedent. Although not specifically authorized or officially adopted as promulgated policy, the violations were so common and well-settled practice that they constituted a custom that fairly represents municipal policy at Shawnee County ADC. Defendants Heather Willier, Maggie Moore and Emily Foster in their supervisor

roles had notice of the pattern of these policy violations by their subordinates and promulgated, created, implemented and possessed responsibility for the continued operation of the violations, which as further described below, constitute unconstitutional acts.

### *October 22, 2023 – Behavioral Health Intake Screening*

167.    Shawnee County ADC Policy IS-E-02.III. titled "Inmate Mental Health Services – Intake Screening" states: "(B) Each inmate that is dressed into the facility shall receive an initial medical screening performed by a qualified medical person…(C)  A qualified medical person shall make appropriate referrals for assessment for mental health services, including services for the developmentally disabled, following the intake medical screening and assessment processes, as necessary."

168.    On October 22, at approximately 2:15 p.m. Decedent, now having been admitted into the jail, was seen by Armor Behavioral Health Professional (BHP) Cami Cocke for his Behavioral Health Intake Screening.

169.    Defendant Cocke indicated on the Intake Screening that Decedent never received psychiatric treatment, had never been hospitalized for psychiatric issues, was not being prescribed psychiatric mediations, and did not have any behavioral health concerns that need to be addressed by a Behavioral Health Professional.



170.    Defendant Cocke's Intake Screening was completely inconsistent with other staff's findings about Decedent since he had arrived at the jail, including: (1) The arresting officer

indicating Decedent was manic; (2) Nurse Claflin indicating Decedent was chemically impaired or suffering from a mental illness; (3) Nurse White's confinement clearance form indicating that Decedent suffered from mental health issues and had a history of being in mental health facilities; and (4) The booking officer indicating that Decedent suffers from mental health issues and had spent time in a mental health facility in the past.

171.    In the Intake Screening, Defendant Cocke described Decedent as "manic and expressed excitement at the thought of harming others." BHP Cocke placed Decedent on "close observation" status and labeled him as "**HIGH RISK: Urgent Referral to Behavioral Health, Active Condition**."

172.    Knowing that Decedent was actively manic and had thoughts of harming others yet had been admitted to the jail without medical clearance, Defendant Cocke failed to have Decedent sent to an Emergency Department for evaluation in violation of Armor Policy J-E-02.

173.    Further, Defendant Cocke failed to provide an urgent referral to Behavioral Health. Decedent did not receive a Behavioral Health Evaluation until November 3 – 12 days after Defendant Cocke indicated he was actively psychotic and placed the high risk, urgent referral.

174.    Shawnee County ADC Policy IS-E-02.IV titled "Inmate Mental Health Services – Mental Health Appraisal" states: "An inmate that has been referred to a qualified mental health person shall receive an evaluation within 14 days of the referral."

175.    This policy and practice to wait up to 14 days for a detainee to be evaluated by a mental health professional is unconstitutional in Decedent's situation in the face of known mania and psychosis. The County and Defendants Heather Willier, Maggie Moore and Emily Foster in their supervisor roles had notice of the policy and promulgated, created, implemented and possessed responsibility for the continued operation of the unconstitutional policy.

*October 23, 2023*

176.    On October 23, 2023, at 9:14 a.m., Armor Nurse Elizabeth Pinon (Peterson) visited Decedent's cell door during daily segregation rounds. She indicated there were no physical or mental health complaints, but that Decedent requested health services. However, no additional health services were provided to Decedent on that day.

177.    At approximately 10:00 p.m., Defendant Ritchie, attempted to have Decedent medically screen in. She noted Decedent was manic, speaking at a rapid rate, and that he even said "I'll do a collusion screening." Yet, she indicated he refused the screening and no medical screening took place.

178.    Also, on October 23, Defendant Foster was to see Decedent during behavioral health segregation rounds. No encounter was made because Decedent was in the shower. Defendant Foster noted Decedent's cell was scattered with trash and items, and that the floor was sticky.

*October 24, 2023 – Behavioral Health Intake Screening*

179.    At 10:28 a.m., Armor Nurse Tamara Holte visited Decedent's cell door during segregation rounds. Nurse Holte indicated there were no physical or mental health complaints.

180.    At 1:53 p.m., Defendant Cocke visited Decedent for a follow up from his Behavioral Health Intake Screening. During this encounter, Defendant Cocke documented that Decedent "forcefully expressed he needs to be on his medications from his doctor, Thomas Chantey at University Health in Kansas City, reporting he was on 1mg of Ativan every four hours. [He] stated [that] he 'may need to kill others to make the symptoms stop if [his] meds aren't 'bridged'…[He] stated he is in the military and needs to be placed in a super max military prison

and wants to harm the officers at the jail." Per her own note, Defendant Cocke responded to this by "walking away."

181.    At this point, less than 48 hours into his detention, Shawnee County and Armor staff had knowledge that Decedent was in an active state of psychosis, that he had a long history of mental health issues, that he was currently being prescribed psychiatric medications by a treating psychiatrist. Yet, he was left on "screen pending" status, waiting to be medically screened.

182.    Despite this knowledge, Armor staff did not attempt to complete his initial medical screening or revise his behavioral health intake screening, both of which required an immediate referral to a hospital emergency room.

### *October 24, 2023 – Finger Laceration*

183.    At approximately 7:59 p.m., corrections officer D. Benfield attempted to shut the pass-through door of Decedent's cell after giving him some water and lacerated Decedent's left ring finger. Medical staff was called, and Officer Benfield, along with Armor staff, determined Decedent needed to go to the hospital for his finger injury.

184.    Armor Nurse Samantha Richie responded to Decedent's cell and submitted an Urgent Care Assessment to Decedent's EMR. In her assessment she noted "VS [Vital Signs] not taken. No consent signed, segregation IM [inmate]. A&O [Alert & Oriented] but also appears manic."

185.    Sergeant L. Alsaad reported to the cell to prepare Decedent for transport to Stormont Vail Hospital. Sgt. Alsaad attempted to put chains around Decedent's ankles for security purposes but was unable to fit them around Decedent's lower left ankle due to his ankle and foot being swollen. Sgt. Alsaad then reported this swelling to Nurse Richie, but a record was never entered into Decedent's EMR.

186.    Sgt. Alsaad indicated he had formed a sort of rapport with Decedent throughout his previous detention periods at Shawnee County and was aware Decedent suffered from some sort of mental illness.

187.    At 9:00 p.m., Decedent arrived at the Stormont Vail Hospital Emergency Department for his finger laceration.

188.    Officer J. Jones assisted Sgt. Alsaad with the transport of Decedent to Stormont Vail Hospital. Neither Sergeant Alsaad or Officer Jones alerted Stormont Vail medical staff that Decedent had not yet been medically screened, was in a state of active psychosis and/or mania, and had a long history of severe mental illness.

189.    Defendant Ritchie also failed to notify the hospital that Decedent was experiencing mania and had swelling in his left ankle and foot.

190.    As a result, the Stormont Vail medical staff never evaluated Decedent's mental health or his leg. Instead, they only applied sutures to his finger laceration and sent him back to Shawnee County ADC.

191.    Decedent returned to Shawnee County ADC at 11:34 p.m. with orders to have his sutures removed in 7 days. Decedent was then placed back in an administrative segregation cell where he continued to languish without the necessary medical or psychiatric care he desperately needed.

### *October 25, 2023*

192.    On October 25, 2023, at 9:21 a.m., Defendant Claflin visited Decedent's cell door during segregation rounds. Defendant Claflin indicated there were no physical or mental health complaints.

37

193.    30 minutes later, Armor Nurse Dawn Briney conducted another segregation rounds check, and again indicated there were no physical or mental health complaints.

194.    At 2:04 p.m., Defendant Heidi White visited Decedent's cell to see if he would complete his medical screening, which he allegedly refused. She completed a Refusal of Treatment form. In it Defendant White did not indicate any reason for refusal. However, under "Potential Consequences," she noted "[u]nknown medical and mental health diagnoses, that untreated, could ultimately lead to death."

195.    Defendant White also generated a SOAPE Progress Note during this encounter with Decedent. She detailed her interaction with Decedent, describing him standing at his cell door with no clothes on, and after being asked to do his medical intake, he replied "Yes." Defendant White then asked Decedent if he had clothing to put on, Decedent again said "Yes." After Defendant White returned with a DOC employee to help transfer Decedent to the clinic to complete his screening, Decedent was sitting on his mattress, still completely naked, shaking his head back and forth. Defendant White again asked if Decedent would get dressed and complete his medical screening, Decedent shook his head no, which was accepted as a refusal, and Defendant White ended the encounter stating, "no acute medical distress noted at this time."

196.    At 9:30 p.m., Armor Nurse Jeanette Henry visited Decedent's cell for another attempt to have him complete his medical intake screening. In the Refusal of Treatment form, she noted Decedent was completely naked, responding to internal stimuli while pacing his cell, and did not acknowledge her presence at the cell door. Nurse Henry accepted this as a refusal and ended the encounter.

197.    Also, on October 25, Decedent was observed smearing feces on his door.

198.    In the Segregation Status Logs, on October 25, Sgt. Alsaad indicated Decedent was banging on his cell door all night and had not slept in two days.

### *October 26, 2023*

199.    On October 26, 2023, at 8:26 a.m., Armor Nurse Elizabeth Pinon (Peterson) documented that she visited Decedent's cell during segregation rounds. However, video footage revealed that Nurse Pinion never went to Decedent's cell that day. Another Nurse, Nurse James, walked by Decedent's cell without stopping, and stated "you're okay" to Decedent, and walked away. Nurse Peterson's documentation indicated no physical or mental health complaints, but indicated that Decedent made a request for Health Services. Health Services did not respond to this request.

200.    At approximately 12:10 p.m., Armor Psych Tech (PT) Defendant Cassandra Gumbel, recorded a patient communication note which detailed a conversation she had with Decedent's mother, Plaintiff Jan Branson. Ms. Branson told PT Gumbel that she was the legal guardian for Decedent and provided a copy of the guardianship paperwork from the court. Ms. Branson expressed her concern for Decedent's mental health status and that he would try to harm others. Defendant Gumbel's note documenting the conversation states: "Mr. Oliva's mom called - Jan Branson she is the guardian of Mr. Oliva. She called to asked about how he is and how he is mentally. She provided me a copy of guardianship paperwork. I let Mrs. Branson know that he was not doing the best that he was currently in seg because of how aggressive/angry he is. I let her know that on Sunday when the BHP spoke to him he was not a happy camper and is very angry at 3 certain people. I let her know he wants to go to a military prison. She informed me that is our best interest not to let him in population with other people because when he is in this mode he is

VERY aggressive and will try and harm others. After the phone call I called Captain Park to inform

her of what his mother had said regarding his aggression and is not a good idea to be with others."

201.    During this call, Ms. Branson requested that Decedent be transferred to Larned

State Hospital, where Decedent had previously been hospitalized, but Defendant Gumbel said they

could handle his care at Shawnee County ADC. Ms. Branson also informed Defendant Gumbel

that Dr. Thomas Chaffee was Decedent's treating psychiatrist.

202.    Decedent's Letters of Guardianship were scanned into his EMR and indicated Ms.

Branson had power and duties as guardian for Decedent, with the explicit authority to admit

Decedent to a treatment facility.

203.    At 9:30 p.m., Nurse Jeanette Henry visited Decedent's cell to ask if he would

complete his medical intake screening. In her Refusal of Treatment form, Nurse Henry noted

Decedent had tangential speech, he was responding to internal stimuli, he was unable to focus on

any conversation, and he did not acknowledge the presence of a Nurse. Nurse Henry accepted this

as a refusal of treatment and ended the encounter with Decedent. Nurse Henry never contacted

Plaintiff Branson as Decedent's guardian.

204.    Also on October 26, Decedent was observed urinating on the floor of his cell and

laying his blanket over it.

205.    At this point in Decedent's detainment, Armor and DOC staff were fully aware that

Decedent was suffering from severe mental health disorders, had a legal guardian responsible for

his medical decision making, who requested he be transferred to an outside mental health facility,

and had been provided with a copy of Decedent's guardianship paperwork. Nevertheless, DOC

and Armor staff continued to force Decedent to languish in segregation while suffering an acute

mental health emergency.

206.    After five days of detainment, Decedent had not been taken to an emergency room or Larned State Hospital for his mental health; he had not received a Behavioral Health Evaluation or been seen by Armor's Psychiatrist, Dr. Mariana Mack; and he had not even been medically cleared to be in the jail.

### October 27, 2023

207.    On October 27, 2023, Defendant White completed segregation rounds around 8:15 a.m. and noted no physical or mental health complaints for Decedent.

208.    At 1:36 p.m., Armor Physician Assistant Karen Hammond, recorded a Hospital Discharge Follow-Up with Decedent. PA Hammond conducted a chart review and noted Decedent was still on "screen pending" status, and therefore, nursing was attempting to see him multiple times per day. As a result, PA Hammond believed she did not need to personally follow up with Decedent based off her review of the hospital paperwork.

209.    Armor nursing staff failed to visit Decedent at any point throughout the day to attempt to have him complete his medical intake screening, continuously violating Armor Policy J-E-02 requiring nursing staff to attempt to screen him every 2 hours until the screening is complete.

210.    Around 4:00 p.m., Decedent was found to again have feces in his cell.

### October 28, 2023

211.    On October 28, 2023, at approximately 6:08 a.m., Armor Nurse Andrika Dawn was assigned to visit Decedent's cell to see if he would complete his medical intake screening. As she was approaching Decedent's cell, Officer Douglas stated Decedent was very irate, yelling at his cell door, and that it was not a good idea to approach his cell to attempt to have him screened in.

Nurse Dawn stated Officer Douglas suggested she put it down as a behavioral refusal, which she did and ended the encounter without ever seeing Decedent.

212.    In the Refusal of Treatment form under "potential consequences explained," Nurse Dawn wrote "untreated medical/mental health issues [and] potential death."

213.    At approximately 8:00 a.m., Defendant Richie visited Decedent's cell during segregation rounds. Nurse Richie noted no physical or mental health complaints in the Confinement Log entered into Decedent's EMR.

214.    On October 28, at approximately 8:16 p.m., Armor Nurse Elizabeth James visited Decedent's cell to see if he would complete his medical intake screening. However, video footage showed Nurse James was at Decedent's cell door for less than five seconds. Nurse James noted Decedent would not speak to her, and he was playing in the water in the floor grate, which was used for toileting in his cell.

### October 29, 2023

215.    On the morning of October 29, 2023, Nurse Elizabeth Pinon (Peterson) documented that she conducted segregation rounds on Decedent. However, video footage revealed Nurse Pinon did not visit Decedent's cell.

216.    There is no record of a Refusal of Treatment form on this date, or any indication that nursing staff attempted to have Decedent complete an initial medical screening.

217.    At this point in Decedent's detainment, he had been in solitary confinement at ADC for a full seven days, while suffering from an acute mental health emergency. Yet, he had not undergone a medical screening to identify his conditions or treatment needs.

*October 30, 2023*

218.    On October 30, 2023, at 8:34 a.m., Armor Nurse Tamara Holte entered a Confinement Log, documenting her segregation round, into Decedent's EMR, noting no physical or mental health complaints. However, video footage revealed Nurse Holte was never at Decedent's cell on this day.

219.    On October 30, Armor nursing staff did not attempt to have Decedent complete his medical screening.

220.    On October 30, despite not having Decedent's consent, Armor nursing staff forced Decedent to receive an influenza vaccine without him signing the Authorization to Administer Vaccine form. Armor staff administered an influenza vaccine, yet continued to deny him necessary medical and mental health treatment, claiming he was refusing it.

*October 31, 2023*

221.    On October 31, 2023, Defendant Richie entered a Confinement Log, documenting her segregation round, into Decedent's EMR which noted no physical or mental health complaints. However, video footage revealed Nurse Richie never went to Decedent's cell that day.

222.    Nurse Samantha Anderson walked by Decedent's cell but she did not speak to Decedent at all.

223.    Also on October 31, Defendant Foster visited Decedent during behavioral health segregation rounds. Defendant Foster noted no significant physical complaints, but noted complaints regarding Decedent's mental health status. Defendant Foster provided the following description of Decedent: "Pt was seen 10/31/23 and was lying naked on the floor on his back and had urinated on the floor coming under the door. He was talking to unseen others and rubbing his

hands all over himself. He appeared disoriented but was not harming himself. He has been referred to psychiatry."

224.    Armor staff never attempted to have Decedent complete his medical screening for the third consecutive day.

*November 1, 2023*

225.    On November 1, 2023, Nurse Jia Bondoc visited Decedent during segregation rounds. She noted no physical or mental health complaints in the Confinement Log.

226.    Nurse Dana Rohrbaugh visited Decedent's cell around noon to attempt to have him complete his medical screening. She indicated that Decedent refused medical screening and completed a Refusal of Treatment form stating there was no reason for refusal and listed the potential consequences explained as "Poss. Death."

227.    At 12:15 p.m., Nurse Rohrbaugh entered a Non-Patient Encounter Note in Decedent's EMR which read: "Patient vocal, stated he wanted to screen but wouldn't come to door, wouldn't put on clothing, wouldn't answer questions. Screening not completed."

228.    Despite Decedent explicitly stating he wanted to complete his medical screening and recognizing that not screening him would result in his death, Armor staff failed to take reasonable steps to provide him medical care or even ensure the screening was completed.

229.    At approximately 1:05 p.m., it was again noted that Decedent's cell appeared soiled.

230.    At approximately 4:00 p.m., Dr. Mariana Mack and PT Gumbel were observed entering segregation module. They approached Decedent's door and then walked away shortly thereafter, leaving the module at 4:07 p.m. There is no record of this encounter in Decedent's EMR.

*November 2, 2023*

231.   On the morning of November 2, 2023, at approximately 8:19 a.m., Nurse Jia Bondoc visited Decedent's cell during segregation rounds. In the Confinement Log, she noted no physical or mental health complaints.

232.   A short time later, around 8:45 a.m., Nurse Bondoc returned to attempt to have Decedent complete his medical screening, and again indicated he refused. In the Refusal of Treatment form, Nurse Bondoc listed the potential consequences of refusal as "worsening condition and/or possible death."

233.   Nurse Bondoc described Decedent as "nonsensical" and when asked whether she explained the potential consequences of Decedent refusing to complete his medical screening, she stated, "I don't think he really understood what that meant." Nonetheless, Nurse Bondoc and Armor staff continued to indicate Decedent refused treatment.

234.   On November 2, a week after their initial conversation, Defendant Gumbel contacted Decedent's mother and guardian, Plaintiff Jan Branson, to inquire about Decedent's recent medical or mental health history. Ms. Branson had already provided the name and contact information for Decedent's long-time Psychiatrist, Dr. Thomas Chaffee. Defendant Gumbel told Ms. Branson they were "in the process of what our plan of action is for Matthew because he is not doing well."

235.   Defendant Gumbel stated Armor does not force medication but since Decedent has a legal guardian, "there is a fine line that we are on that if we could get him [Decedent] to take meds or an injection, would that be something she [Ms. Branson] would like." Ms. Branson stated she would like him on meds and requested they contact Dr. Chaffee.

45

236.    Armor had previously administered an influenza vaccine to Decedent without obtaining consent from either Decedent or his legal guardian. Yet, Armor claimed they were unable to force Decedent to take essential psychiatric medication, citing concerns about consent despite his guardian's consent. This inconsistent approach highlights a critical failure in providing Decedent the necessary medical care he deserved.

237.    On November 2, Defendant Gumbel contacted Dr. Thomas Chaffee, Decedent's psychiatrist at University Health Truman Medical Center in Kansas City, Missouri. Dr. Chaffee provided the medications Decedent was prescribed and described his severe symptoms when he is off his medication. Dr. Chaffee said he would be willing to do anything he could to help if needed and provided his personal cell number to reach in case of emergency.

238.    On the afternoon of November 2, Defendant Foster spoke with Defendant Armor Health Services Administrator (HSA) Maggie Moore and Defendant Shawnee County Health Services Liaison (HSL) Heather Willier regarding Decedent's mental and medical condition. Defendant Foster indicated she asked to have nursing attempt to get Decedent to complete his medical intake screening so she could petition for Decedent to be involuntarily committed to a state mental hospital due to his behaviors. None of them took him to the hospital or took the steps to have him committed to a state mental hospital. His guardian had previously not only consented to, but requested, this treatment.

239.    Despite having a legal guardian with full authority to make decisions regarding Decedent's care and his treating psychiatrist on call to take whatever steps necessary to have Decedent treated, Armor and Shawnee County staff needlessly delayed sending Decedent to a state mental facility by insisting on completing a medical intake screening that they refused to complete

on him. This screening never happened since Decedent's detention on October 22, 2023, due to his mental state. The delay in treatment ultimately caused Decedent's death.

*November 3, 2023*

240.    On November 3, 2023, at approximately 8:08 a.m., either Nurse Dawn Briney or Nurse Tamara Holte conducted segregation rounds. Surveillance footage showed the Nurse glancing at the door and walking away, not making any attempt to speak to Decedent. Nevertheless, Decedent's Confinement Log stated there were no physical or mental health complaints during this encounter.

241.    Later that morning around 11:24 a.m., Defendant Mack, Defendant Gumble, and Defendant Moore visited Decedent's cell door for less than a minute.

242.    An hour later, at 12:30 p.m., Defendant Mack and Defendant Gumble returned to Decedent's cell door. Again, they were only there for less than a minute.

243.    At 3:11 p.m., Defendant Mack entered a Behavioral Health Initial Evaluation into Decedent's EMR. This evaluation was the follow-up from Decedent's Behavioral Health Initial Intake Screening which occurred 13 days earlier, on October 22, 2023.

244.    It took 13 days for Defendant Mack to evaluate Decedent after behavioral health staff found Decedent to be manic and classified him as "HIGH RISK; Urgent Referral to Behavioral Health, Active Condition."

245.    Defendant Mack's behavioral health evaluation highlighted the mental deterioration Decedent was experiencing. She stated Decedent was suffering from mania, aggression, and psychosis. She described Decedent as being very malodorous, smearing feces, not showering, mumbling to himself, having periods of agitation and aggression, and speaking in monotone.

246.    Defendant Mack noted Decedent's extensive mental health and medical history, including multiple admissions to mental health hospitals and/or treatment facilities, his long history of antipsychotic prescriptions, and history of cellulitis in his leg.

247.    Defendant Mack stated Decedent was unable to participate in the evaluation except for answering one question – whether he wanted his medication or not. In response to that question, Decedent came to his cell door nude and answered yes twice. Despite Decedent's deteriorating mental capacity and being in an acute mental health emergency, he expressed his dire need for his medication, which he had now gone almost two full weeks without since being detained.

248.    Defendant Mack then spoke to Decedent's guardian, Plaintiff Branson, to discuss medications for Decedent which Ms. Branson again stated he needed.

249.    Defendant Mack scheduled baseline labs for Decedent for "the end of next week" to measure his Depakote and CPK levels, among others. However, the lab results were never obtained. They were ordered too late as Decedent was found unresponsive in his cell less than two days later.

250.    If taken the labs would have revealed Decedent's physical deterioration.

251.    On the night of November 3, Nurse Elizabeth James visited Decedent's cell to see if he would complete his initial medical screening. After less than 10 seconds at Decedent's door, Nurse James ended the encounter and completed a Refusal of Treatment form.

252.    At some point on the night of November 3, Correctional Officer Nickel observed Decedent eating his own feces.

***November 4, 2023***

253.    Decedent did not move from the floor of his cell on November 4.

254.    At 8:50 a.m., on November 4, 2023, Armor Nurse Donna Pantoja visited Decedent's cell during segregation rounds. Nurse Pantoja entered a Confinement Log into Decedent's EMR at 6:19 p.m., in which she noted no physical or mental health complaints, and stated Decedent refused medical help.

255.    Shawnee County Correctional Officer Hart stated he was concerned with Decedent at this point due to not being as responsive as in the past. Officer Hart stated he felt something was off with Decedent, and he discussed Decedent's condition with Correctional Officer Dustin Addington. Officer Addington dismissed Officer Hart's concerns, saying that's just how Decedent is.

256.    At approximately 9:30 p.m., Nurse Kristin Stanfill visited Decedent's cell for a screen pending check to see if he would complete his medical screening. According to Nurse Stanfill, Decedent refused to respond, and she ended the encounter. In the Refusal of Treatment form, Nurse Stanfill noted illness, infection, and possible death as the potential consequences explained to Decedent. However, video footage revealed Nurse Stanfill never visited Decedent's cell that night.

257.    Less than 10 hours later, Decedent was found unresponsive and transferred to Stormont Vail Hospital with a litany of severe medical conditions.

### *November 5, 2023*

258.    On November 5, 2023, at 6:20 a.m., Officer Branam took a report from Correctional Officer J. Nickel that Decedent had been in the same position most of the night, covered in feces, and that his cell was a disaster.

259.    At approximately 7:20 a.m., on November 5, 2023, Officer Petesch was conducting segregation rounds and found Decedent on the floor naked, covered in feces and urine. He notified

Sergeant Ross of Decedent's status and Sergeant Ross advised to get Decedent up and put him in the shower. Officer Petesch and Officer Branam attempted to move Decedent but were unable to get him off the floor as Decedent was completely unresponsive. Officer Branam contacted Sergeant Ross notifying her of his concerns that Decedent was not responding and he had saliva built up on the side of his mouth. At this point, Officer Branam and/or Officer Petesch contacted Armor nursing staff and had them report to Decedent's cell.

260.    The photo below shows Decedent in his cell when officers responded to him on the morning of November 5, 2023.



261.    After placing Decedent in handcuffs, one officer states, "his leg is fucked, it wasn't like that" and then Sergeant Ross radios, "you need to come in here, I know it's gross, but his leg

is like stiff and it's red and it wasn't like that before." At this point, officers were told to leave Decedent on the ground until EMS arrived and could take him to the hospital.

262.    Armor Nurse Leticia Kuhlman responded to Decedent's cell. She described Decedent as being minimally responsive on the floor of his cell, resting in feces and urine. She described white foam around Decedent's mouth, indicating possible emesis. Decedent had an altered level of consciousness, with his eyes appearing to roll to the back of his head at times. Nurse Kuhlman noted lower left leg discoloration which was warm to the touch.

263.    At 8:08 a.m., Armor staff along with Sergeant Ross decided to call American Medical Response (AMR) to transport Decedent to Stormont Vail Hospital due to the severity of his injuries and concerns of sepsis and cellulitis.

264.    The photo below shows the severe discoloration and deterioration of Decedent's left leg.



265. While AMR was transferring Decedent from his cell to the ambulance, they asked Sergeant Ross a series of questions regarding Decedent's mental state. Sergeant Ross stated, "he is very Sig Three, so a lot of the things he says doesn't make sense, but it's at least English where you can understand what he is trying to say." AMR then asked: "is he normally able to tell you he's here or the year?" Sergeant Ross responded, "his conversations are all over the place. If you get him focused for two minutes you can get it. But, no, not normally."

266. Sergeant Ross's answers to these few questions show the extremely deficient mental state Decedent was in throughout his detainment at Shawnee County ADC, and that the ADC staff knew Decedent was unable to provide competent answers to even the most basic questions as what year it was.

267. Decedent arrived at the Stormont Vail Emergency Department at 8:47 a.m. He was diagnosed with severe sepsis, acute kidney failure, rhabdomyolysis, an esophageal rupture, and cellulitis of his lower left leg, among a litany of other conditions.

268. Due to the severity of his condition, medical providers at Stormont Vail Hospital decided Decedent needed to be transferred to a hospital with a higher level of care. At 3:44 p.m., Jackson County EMS arrived at Stormont Vail to transfer Decedent to KU Medical Center.

269. Decedent arrived at KU Medical Center at 4:44 p.m., where he remained in the ICU until his death on November 17, 2023.

270. Decedent's death certificate listed his primary cause of death as "Complications of Lower Left Leg Infection."

271. Decedent's death was a direct result of the systemic failures by Armor and the Shawnee County ADC to provide him with appropriate medical and mental health care. Despite being in an acute manic state and having a well-documented history of severe psychiatric illness

and deteriorating physical health, Armor failed to properly assess and treat Decedent during his 14 days in custody.

272.    Although Defendants documented that Decedent repeatedly "refused" to complete his medical screening, he often did not, and he lacked the mental capacity to make his own medical decisions. Armor staff disregarded the fact that Decedent had a legal guardian with full authority to make medical decisions on his behalf, yet they continued to accept his refusals and never completed the intake screening. This neglect, combined with the jail staff's failure to identify the critical condition of his lower left leg until the morning of November 5, 2023, led to his rapid deterioration. By the time medical staff finally acted, Decedent was suffering from severe sepsis, acute kidney failure, and cellulitis—conditions that had gone untreated for far too long. His death could have been prevented had Armor and the Shawnee County staff acted with the urgency and care his condition required.

**B. Additional Facts Pertaining to Corporate and County Liability**

273.    Plaintiffs adopt and incorporate by reference all allegations contained in the above paragraphs as if fully set forth herein.

274.    From the moment he presented at Shawnee ADC, Decedent posed an obvious, known and substantial risk of self-harm. At all relevant times, Decedent had obvious, serious and emergent health needs. Defendants knew of and disregarded the excessive risks to Decedent's health and safety. Defendants failed to provide Decedent with adequate and timely medical and mental health care, protection or supervision in deliberate indifference to his health and safety. Defendants' deliberate indifference to the excessive risks to Decedent's health and safety was a direct and proximate cause of his death.

275.    The unconstitutional conduct alleged in this complaint was carried out in accordance with the official policies and/or longstanding customs and practices of Armor Health and Shawnee County.

276.    Defendants Shawnee County, Armor, Willier, Moore, and Foster failed to promulgate and implement, and knowingly failed to enforce, adequate medical and mental health policies responsive to the serious medical and mental health needs of inmates like Decedent. In particular, during all times pertinent, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to arrestees' and detainees' medical and mental health needs.  Specifically, Defendants' policies, practices, procedures, and customs were inadequate in ways that include, but are not limited to, the following:

a)  Allowing arrestees, like Decedent, to be admitted into the facility without a medical clearance assessment;

b)  Allowing arrestees, like Decedent, to be admitted into the facility without an intake screening;

c)  Allowing arrestees, like Decedent, to be admitted into the facility when immediate medical care is necessary;

d)  Failing to send arrestees to a hospital emergency room when they appear mentally ill or demonstrate signs and behaviors of acute mental illness;

e)  Allowing detainees, like Decedent, to be housed in segregation without a medical clearance, without an intake screening or when they are unscreenable;

f)  Allowing detainees, like Decedent, to be housed in segregation when they appear mentally ill or demonstrate signs and behaviors of acute mental illness;

g) Failing to have officers observe detainees, like Decedent, at least daily when housed in segregation;

h) Failing to have medical staff observe detainees, like Decedent, at least every two hours when they are deemed unscreenable or are considered to have refused screening;

i) Failing to observe detainees for signs and behaviors of acute mental illness;

j) Failing to immediately consult the Psychiatrist when a detainee appears mentally ill;

k) Failing to relay and communicated signs and behaviors of acute mental illness in detainees, like Decedent, between correctional and medical staff;

l) Failing to provide timely medical and mental health assessments for detainees, including delays in conducting intake screenings, mental health appraisals, and baseline lab work for inmates in acute crisis;

m) Failing to immediately address clear signs of medical and mental health emergencies, such as mania and psychosis, as well as visible physical issues like swelling, discoloration, infection, dehydration and malnutrition;

n) Failing to implement and enforce emergency response and transfer protocols to ensure detainees with altered mental status or severe physical deterioration are promptly transferred to appropriate medical or mental health facilities;

o) Improperly relying on mentally incapacitated detainees' refusals of medical treatment without recognizing their ability to make informed decisions or involving their legal guardians authorized to make medical decisions on their behalf;

p) Failing to adequately monitor and document detainees' physical and mental health conditions, particularly those placed in segregation or restrictive housing;

q) Allowing detainees to remain in unsanitary and inhumane conditions, such as being left covered in feces and urine for extended periods, further exacerbating their physical and mental health issues;

r) Failing to properly train and supervise staff to recognize and respond to signs of serious mental health crises and physical deterioration, resulting in delayed or absent interventions;

s) Enforcing and maintaining systemic policies and procedures that directly or indirectly permitted delays, neglect, and inadequate and absent care for detainees, like Decedent, with serious medical and mental health needs.

277.    Defendants Shawnee County, Armor, Willier, Moore, and Foster have promulgated, implemented, and maintained policies, practices, procedures, and/or customs which resulted in the deliberate indifference to Decedent's serious medical needs.  These specific policies include, but are not limited to:

1. Shawnee County Policy IS-E-01: Inmate Medical Services

   i. Fails to take into account what the arresting officer determined about the inmate's medical and mental health condition;

   ii. Fails to describe mental health issues, including mania as an emergent condition;

   iii. Fails to require medical personnel to seek hospitalization upon identifying emergent mental health issues, including mania;

   iv. Fails to require the officer to seek hospitalization for emergent conditions or when immediate medical attention is necessary, even if the supervisor and medical personnel do not seek hospitalization;

   v. Fails to require follow up when potential mental health issues are recognized. Immediate and consistent follow up should be required until the detainee is determined not to have mental health issues or until the mental

health issues are medically addressed by medication management overseen by a physician or the detainee is hospitalized.

2. Shawnee County Policy IS-E-02: Inmate Mental Health Services

    vi. Fails by allowing up to fourteen (14) days for an inmate to receive a mental health appraisal. 14 days is too long for an evaluation of an inmate suffering from an emergency mental health condition, such as mania;

    vii. Fails by allowing up to 14 days for an inmate with an "urgent referral" to receive a mental health appraisal;

    viii. Fails to describe psychiatric needs and conditions which exceed the treatment capabilities of the department, or when an inmate shall be referred to available community resources;

    ix. Fails to account for inmates that lack capacity to make medical decisions and have a legal guardian who is responsible for the inmate's medical decision making.

3. Shawnee County Policy IO-A-29: Management of Segregation Inmates

    x. Fails to require mandatory referral when an inmate is exhibiting signs of emergent mental health conditions, including mania;

    xi. Fails to require supervisors ensure segregation inmates exhibiting signs of mental illness receive proper medical and/or mental health evaluation and treatment, or are transferred to the proper mental health facility or hospital.

4. Armor Policy J-E-02: Receiving Screening

    xii. Fails to account for inmates that lack capacity to make medical decisions and have a legal guardian who is responsible for the inmate's medical decision making.

    xiii. Fails to provide a procedure for inmates who continuously refuse to perform their medical screening. At some point, Armor must ensure the inmate is properly screened or transferred to a mental health facility or hospital.

278.    Defendants Armor, Moore, and Foster maintained a policy, practice, and/or custom of providing untimely assessment, identification and treatment of inmates' medical and mental health needs, in disregard of known, obvious and excessive risks to the health and safety of inmates like Decedent. Specifically, regarding the initial medical screening process for individuals with severe medical and mental health needs, as outlined in their policy J-E-02: Receiving Screening. Despite requiring immediate screening upon arrival to identify urgent health needs, Decedent's screening was never completed during his entire detention, largely due to Armor staff accepting his refusals despite his obvious lack of mental capacity to make informed decisions. Even though Decedent had a legal guardian authorized to make medical decisions on his behalf, Armor failed to utilize this authority and continued to rely on Decedent's inability to complete the screening. This policy failed to address issues of an inmate's mental incapacity or legal guardianship and what the procedure is in such cases. This failure to complete the medical intake process left critical health conditions undiagnosed and untreated, contributing to his rapid physical and mental deterioration, and ultimately his death.

279.    Defendant Armor failed to adequately train and supervise its staff to ensure compliance with policy J-E-02: Receiving Screening, which is critical for identifying a patient's urgent medical and mental health needs upon entry into the facility. Specifically, Armor failed to train and supervise staff on how to properly complete intake screenings for patients with severe mental health issues, how to recognize when a patient lacks the capacity to refuse medical screening, and how to involve legal guardians to ensure necessary medical care is provided. These failures led to repeated delays in completing Decedent's medical screening and resulted in a dangerous failure to identify and address his serious medical and mental health conditions. Armor had notice of these failures and knew that they subjected patients with significant health needs to

a substantial risk of serious harm, yet failed to correct them, resulting in Decedent's suffering and death.

280.    Defendant Armor also failed to adequately train and supervise its staff to ensure compliance with policy J-E-02: Receiving Screening which is critical for identifying and addressing patients' urgent medical and mental health needs. Specifically, under J-E-02(11)(d), patients exhibiting altered mental status who refuse intake are to be sent for evaluation in the Emergency Department. Decedent clearly exhibited signs of severe mental instability, including erratic behavior and refusal to complete his medical screening, as well as the arresting officer stating he appeared to be "hyper" or "manic." Rather than transferring him to the Emergency Department as required by the policy, Armor staff failed to take this necessary action. This lack of compliance resulted in Decedent's medical condition deteriorating rapidly while in custody, leading to his eventual death. These failures were either due to an inadequate policy, or insufficient training and supervision of Armor staff, who failed to recognize the severity of Decedent's condition and take the appropriate steps to ensure his immediate care.

281.    Defendants Shawnee County and Willier have also maintained a policy, practice and/or custom of providing untimely assessment, identification and treatment of inmates' medical and mental health needs, in disregard of known, obvious and excessive risks to the health and safety of inmates like Decedent. At all times pertinent, it was the policy of Shawnee County, under policy IS-E-02: Inmate Mental Health Services, that "an inmate that has been referred to a qualified mental health person shall receive an evaluation within 14 days of the referral." Defendant Shawnee County and Willier knew this policy was inadequate due to previous instances at Shawnee County ADC in which this exact provision was found to cause a delay in treatment which ultimately led to the death of an inmate. Yet, despite their knowledge of its deficiencies and the

excessive risks to the health and safety of inmates like Decedent, neither Defendant Shawnee County nor Willier amended or revised the policy. This delay in treatment is far too long for inmates suffering from an acute mental health emergency like Decedent. Decedent's mental health condition deteriorated rapidly, and within that 14-day window, he was found unresponsive and transferred to the hospital in critical condition. Shawnee County's failure to conduct timely assessments and provide necessary interventions during this period directly contributed to his worsening condition and eventual death.

282.     Defendant Shawnee County and Willier further failed to properly train and supervise its staff in identifying and responding to inmates in an acute mental health emergency, as required by IS-E-02. Staff failed to conduct timely assessments, properly document Decedent's condition, or escalate his care when his mental health deteriorated. Specifically, IS-E-02 requires staff to maintain an Inmate Health and Well Being Checklist and Inmate Meal Chart for an inmate in segregation housing. This allows medical staff to review the documentation every 24 hours and monitor each inmate's medical and mental health status. However, these forms were never initiated and maintained for Decedent. This failure to ensure proper documentation of Decedent's medical and mental health status allowed Decedent's condition to worsen without intervention, ultimately leading to his death.

283.     Shortly after Decedent's death, the Shawnee County Intelligence and Investigations (I&I) team investigated Decedent's detainment and death. This investigation revealed that Defendants Shawnee County, Armor, Willier, Moore, and Foster also maintained policies, practice, procedures, and customs which led to systemic failures throughout Decedent's detention. These systemic failures include, but are not limited to, the following:

a. Defendant Armor failed to ensure compliance with its policy, J-E-02, regarding screen pending checks, which required nursing staff to check on patients every two hours while they remained in screen pending status. Decedent was on screen pending status throughout his detention, and despite the requirement, only 13 attempts were recorded, with just 9 being fully completed. Moreover, several refusal forms were filled out without Nurses actually visiting Decedent. On numerous occasions, nursing staff failed to conduct proper checks, neglecting to offer Decedent the opportunity to complete his screening or to assess his deteriorating condition. Armor's failure to ensure that screen pending checks were completed as required contributed to Decedent's untreated medical conditions and his eventual death. The below images from the I&I investigation show the investigators' concerns with Armor staff's screen pending (image 1) and segregation visits (image 2) to Decedent's cell.

Medical Visit's for Oliva

*Screen Pending attempts*

| Date | Nurse | Refusal | Obs. In S | Special notes |
|---|---|---|---|---|
| 10/22/2023 | NA | NO | NA | No task entered |
| 10/22/2023 | E. James | Yes | NO | **Did enter Special** *but ø go to Oliva dca* |
| 10/23/2023 | NA | NO | NA | No task entered |
| 10/23/2023 | S. Richie | Yes | Yes | No concerns |
| 10/24/2023 | NA | NO | NA | No task entered |
| 10/24/2023 | XXXXX | NO | XXX | No Attempt |
| 10/25/2023 | H. White | Yes | Yes | No concerns |
| 10/25/2023 | J. Henry | Yes | Yes | No concerns |
| 10/26/2023 | J. Henry | Yes | Yes | No Concerns |
| 10/26/2023 | NA | NO | NA | No task entered |
| 10/27/2023 | XXXXX | NO | XXX | No Attempt |
| 10/27/2023 | NA | NO | NA | No task entered |
| 10/28/2023 | A. Dawn | Yes | Yes | Does not approach cell |
| 10/28/2023 | E. James | Yes | Yes | Less than 5 seconds at door |
| 10/29/2023 | L. Peterson | NO | Yes | L. Peterson not at door, new nurse Donna? |
| 10/29/2023 | NA | NO | NA | No task entered |
| 10/30/2023 | H. White | Yes | Yes | No concerns |
| 10/30/2023 | NA | NO | NA | No task entered |
| 10/31/2023 | S. Anderson | NO | Yes | Did not appear to speak to Oliva |
| 10/31/2023 | NA | NO | NA | No task entered |
| 11/1/2023 | J. Bondoc | Yes | Yes | *NO Concerns* |
| 11/1/2023 | NA | NO | NA | No task entered |
| 11/2/2023 | D. Rohrbaugh | Yes | Yes | At door less than 30 seconds |
| 11/2/2023 | NA | NO | NA | No task entered |
| 11/3/2023 | NA | NO | NA | No task entered |
| 11/3/2023 | B. James | Yes | Yes | At door less than 10 seconds |
| 11/4/2023 | NA | NO | NA | No task entered |
| 11/4/2023 | K. Stanfill | Yes | NO | **Did enter Special** |
| 11/5/2023 | NA | NO | NA | Sent out to hospital before completed |
|  |  |  |  |  |
|  |  |  |  |  |

Confinement Logs

| Date | Nurse | Obs. In S | Special Notes |
|---|---|---|---|
| 10/22/2023 | None | XXX | Arrived to facility, Seg clearance completed |
| 10/23/2023 | E. Peterson | Yes | MH E. Foster too |
| 10/24/2023 | T. Hotle | Yes | Holte did not go to door, Shannon and new nurses did. |
| 10/25/2023 | K. Clafin | Yes | No concerns |
| 10/26/2023 | E. Peterson | Yes | Only says "you're okay" and walks by without stopping |
| 10/27/2023 | H. White | Yes | Shannon at door |
| 10/28/2023 | S. Richie | Yes | Does not stop to talk to Oliva |
| 10/29/2023 | E. Peterson | Yes | Liz not at door New nurse Donna (?) at door |
| 10/30/2023 | T. Hotle | Yes | Heidi White at door not Hotle |
| 10/31/2023 | S. Richie | No | Sarah Anderson at door not Samantha Richie |
| 11/1/2023 | J. Bondoc | Yes | No Concerns |
| 11/2/2023 | J. Bondoc | Yes | No concerns |
| 11/3/2023 | D. Briney | Yes | Appears no one speaks to him only glances in door |
| 11/4/2023 | D. Pantaio | Yes | Sam VaugnDurr only at door |
| 11/5/2023 | Sent out | XXX | Sent to hospital prior to being completed |
|  |  |  |  |
|  |  |  |  |

b.  Defendant Armor also systemically failed to ensure with its policy, J-E-02, which provides that "if the patient is found to have altered mental status, regardless of the origin, and refuses intake, the patient will be sent for evaluation in the Emergency Department. As such, Decedent should have been sent to the Emergency Department within hours of his arrival at Shawnee ADC. During his initial booking screening, Nurse Claflin described Decedent as acting bizarre, suspecting he was either chemically impaired or had a mental illness. Furthermore, Decedent's arresting officer indicated Decedent was "hyper" or "manic" at the time of his arrest and upon booking. While still in booking, Decedent was observed banging his head on the cell door and smearing his own feces all over the walls and mattress of his cell.  For these reasons, Nurse Claflin and Nurse Siler would not attempt a medical screening due to Decedent's behavior and concerns for their safety. Nevertheless, rather than being sent for evaluation in the emergency Department, Decedent was cleared for confinement in administrative segregation.

c.  Defendant Shawnee County's policy IO-A-29: Management of Segregation Inmates requires shift supervisors to visit segregation inmates <u>daily</u>. However, shift supervisors were observed visiting Decedent on only <u>four</u> occasions, throughout his entire detainment. This systemic failure in not ensuring supervisors were properly visiting Decedent daily led to Decedent's physical and mental deterioration, and ultimately his death.

d.  Further under Shawnee County policy IO-A-29, medical personnel are required to document each visit to a segregation inmate on the inmate's individual segregation log. However, Decedent's segregation log does not indicate a single medical visit

during his detainment. Rather, his segregation log is almost entirely blank, outside of a few days where he was either noted to be uncooperative, or special notes were recorded describing his bizarre behavior. This lack of documentation prevented both Shawnee County and Armor staff from being able to make informed decisions regarding Decedent's physical and mental health status. This precise issue was highlighted by Shawnee County Corrections Specialist Douglas who, in his interview with I&I investigators described Decedent's detainment as "one of those situations where there wasn't a whole lot of information being exchanged about this individual [Decedent]. It seemed no one knew enough about him to make a serious judgment call about him." CS Douglas seemingly expressed remorse when saying, "he [Decedent] could have been better serviced if I had more information about his situation." Shawnee County and Armor staff's systemic failures in following procedure and properly documenting all encounters or interactions with Decedent were detrimental to Decedent's physical and mental health, ultimately leading to his death.

284.     The aforementioned systemic failures were such persistent and widespread practices for Shawnee County and Armor staff, which although not authorized by officially adopted or promulgated policy, were so common and well-settled as to constitute customs that fairly represent Shawnee County and/or Armor policies. These failures constitute a deliberate indifference to the health and safety of inmates like Decedent.

285.     Defendants Shawnee County, Armor, Willier, Moore, and Foster are, and have been, on notice that their policies, practices, procedures and/or customs are inadequate to meet the medical and mental health needs of inmates like Decedent. Specifically, detainee deaths have

occurred at Shawnee County ADC under the same policies and procedures at issue here. Nonetheless, they have failed to reform those policies, practices, procedures and/or customs.

286.    All acts and omissions committed by Defendants Shawnee County and Armor were committed with intent, malice, and/or with reckless disregard for Decedent's constitutional rights. Defendants knew or should have known that their conduct, and the conduct of their employees would naturally and probably result in injury or damage. Nevertheless, they continued the conduct with malice, deliberate indifference, and/or reckless disregard of the consequences.

287.    Defendants Shawnee County, Armor, and the employees and agents of both entities had a duty to treat Decedent in accordance with applicable standards of medical and correctional care. Defendants repeatedly breached those duties, directly and foreseeably resulting in Decedent's damages, including his pain, suffering, and death.

288.    Defendant Shawnee County delegated its constitutional duty to provide persons in its custody with necessary medical and mental healthcare to Defendant Armor. Despite that delegation, Defendant Shawnee County had a continuing, non-delegable duty to ensure that its contracted jail medical provider was providing constitutionally adequate care to those in its custody. Defendant Shawnee County adopted and ratified Defendant Armor's policies, customs, and practices as its own.  As such, Defendant Shawnee County is liable for any unconstitutional policies, customs, or longstanding practices of Defendant Armor that resulted in harm to any person confined in the jail, including Decedent, Matthew Oliva.

289.    Other deaths and accreditation citations at the Shawnee County ADC demonstrate a lack of continuity in inmate care and a pattern and practice of failing to provide timely and adequate medical screenings on inmates.

## CLAIMS FOR RELIEF

## COUNT I

**Cruel and Unusual Punishment in Violation of the Eighth and/or Fourteenth Amendments to the Constitution of the United States**
**(42 U.S.C. § 1983)**

290.    Plaintiffs adopt and incorporate by reference all allegations contained in the above paragraphs as if fully set forth herein.

### A.    Allegations Applicable to all Defendants

291.    While in custody of the Shawnee County ADC, Decedent exhibited strong signs of deteriorating physical and mental health and was in an active state of psychosis.

292.    Decedent faced a serious medical need that put him at a substantial risk of harm, and Defendants disregarded this known and/or obvious risk by failing to take reasonable measures to abate it.

293.    Defendants failed to provide, *inter alia*: transportation to a mental health facility or hospital properly equipped to treat his severe medical and mental health conditions, an adequate or timely medical and/or mental health evaluation, timely or adequate mental health and/or medical treatment, and/or adequate monitoring and supervision for Decedent while he was placed under their care, in deliberate indifference to Decedent's serious medical needs, health and safety.

294.    As a direct and proximate result of Defendants' conduct, Decedent was made to sustain and suffer injuries and damages, including but not limited to conscious pain, suffering, mental anguish, disability, loss of time, medical expenses and other damages prior to his death, and Plaintiff Jan Branson as the Administrator of the Estate of Decedent, Matthew Oliva, is entitled to recover for said damages pursuant to the provisions of 42 U.S.C. § 1983, all of which are in an amount in excess of $75,000 exclusive of interest and costs.

295.     As a direct and proximate result of Defendants' conduct, which caused or contributed to the wrongful death of Decedent, Matthew Oliva, on November 17, 2023, Plaintiffs James Oliva, Jan Branson, and Bradford Oliva and other surviving heirs-at-law of Decedent, Matthew Oliva, have been made to sustain and suffer damages which include, but are not limited to, mental anguish, suffering, bereavement, loss of society, loss of comfort, loss of companionship, loss of services, loss of attention, loss of protection, funeral expenses, and all other elements of damage as permitted by K.S.A § 60-1901, *et. seq.*, all of which are in an amount in excess of $75,000, exclusive of interest and costs.

### B.  Municipal Liability (Shawnee County, Armor Health)

296.     Shawnee County and Armor Health of Shawnee County are each a "person" for purposes of 42 U.S.C. § 1983.

297.     Defendant Shawnee County directly and deliberately participated in denying Decedent medical and mental health treatment for his mania and/or psychosis, and other obviously serious medical conditions which were known to Defendant Shawnee County.

298.     Defendant Shawnee County directly participated in deliberate indifference to the medical needs of Decedent which included, but is not limited to, the following acts:

i.    Failing to provide adequate mental health treatment to Decedent despite clear signs of mania and/or psychosis, including erratic behavior, refusal to cooperate, and visible deterioration in his mental state;

ii.   Failing to transfer Decedent to a medical facility or mental health hospital, despite his obvious need for immediate psychiatric evaluation and treatment;

iii.  Failing to ensure timely and complete mental health assessments, instead allowing Decedent's acute mental health crisis to continue unchecked while in custody;

iv.   Ignoring Decedent's rapidly worsening physical condition, including discoloration and/or swelling in his lower left leg, which went unaddressed until his final day at the facility;

    v.    Allowing Decedent to remain in his cell covered in feces and urine for extended periods of time, contributing to the unsanitary and inhumane conditions that exacerbated his physical and mental health deterioration;

    vi.    Failing to adequately monitor and document Decedent's condition, as required by Shawnee County policies for inmates in restrictive housing and those with serious mental health conditions;

    vii.    Failing to complete required health and well-being check forms and meal chart forms for Decedent, as mandated by policy, which contributed to Decedent being neglected and left without appropriate medical monitoring during his detainment;

    viii.    Continuing to rely on Decedent's refusal of medical and mental health treatment despite his clear incapacity to make informed decisions about his care, instead of intervening based on his deteriorating condition;

    ix.    Failing to train and supervise staff to recognize the signs of serious mental health and physical deterioration in inmates, resulting in delayed or absent interventions during Decedent's time in custody;

299.    Defendant Armor directly and deliberately participated in denying Decedent, Matthew Oliva, necessary medical care for his mania and/or psychosis, and other obviously serious medical conditions which were known to Defendant Armor.

300.    Defendant Armor directly participated in deliberate indifference to the medical needs of Decedent which included, but is not limited to, the following acts:

    i.    Failing to conduct a timely and complete medical intake screening during his detainment at Shawnee County ADC;

    ii.    Actively ignoring Decedent's ongoing mental health crisis and significant physical deterioration, including visible signs of mania and discoloration and/or swelling in his left lower leg.

    iii.    Refusing to transfer Decedent to the Emergency Department, as required under Armor Policy J-E-02(11)(d), despite his altered mental state and inability to complete the medical screening.

iv.   Failing to recognize Decedent's mental incapacity and continuing to rely on his refusal to cooperate with the medical screening, despite his inability to make informed decisions about his own care;

v.   Failing to utilize Decedent's legal guardian, who had full authority to make medical decisions on his behalf, in order to provide the necessary medical treatment and care during his detainment;

vi.   Failing to monitor and document Decedent's worsening condition in accordance with internal policies for patients in segregation and on "screen pending" status.

301.   Defendants Shawnee County and Armor knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Decedent.

302.   Defendants Shawnee County and Armor disregarded the known and/or obvious risks to the health and safety of inmates like Decedent.

303.   Defendants Shawnee County and Armor tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, knew (and/or it was obvious) that such conduct was unjustified and would result in violations of constitutional rights, and was deliberately indifferent to the serious medical and mental health needs of inmates like Decedent.

304.   As a direct and proximate result of the aforementioned acts and/or omissions, policies, practices and/or customs, Decedent and Decedent's heirs suffered injuries and damages alleged herein.

## C. Supervisory Liability (Shawnee County, Armor Health of Shawnee County, Armor Health Management, Willier, Moore, and Foster)

305.   Defendants Shawnee County, Armor Health of Shawnee County, Armor Health Management, Willier, Moore, and Foster are charged with implementing and assisting in developing the policies of the Shawnee County ADC and have shared responsibility to adequately train and supervise its employees.

306.    Defendant Shawnee County possessed supervisory responsibility for the policies and procedures in providing medical care which violated Decedent's constitutional right to receive proper and humane medical treatment while incarcerated at the Shawnee County ADC.

307.    There is an affirmative link between the deprivation of Decedent's right to be free of cruel and unusual punishment and policies, practices and/or customs which Shawnee County promulgated, created, implemented and/or possessed responsibility for.

308.    The policies and procedures of Defendant Shawnee County which violated Decedent's constitutional right to receive proper and humane medical treatment include, but is not limited to, the following:

    i.    Implementing and enforcing a policy IS-E-02(10)(A) that allows for up to 14 days to complete a mental health appraisal, which is unreasonably delayed for detainees in an acute mental health crisis like Decedent, whose condition deteriorated rapidly during that period, leading to his hospitalization and eventual death;

    ii.    Failing to enforce policies that require timely medical intake screenings for detainees exhibiting signs of mental health crises or altered mental status, leading to Decedent's untreated mental health condition;

    iii.    Maintaining policies that permitted staff to ignore Decedent's severe physical deterioration, including his visibly swollen lower left leg, until his condition was critical;

    iv.    Implementing policies that allowed detainees like Decedent to remain in unsanitary and inhumane conditions, including being left in his cell covered in feces and urine for extended periods of time, contributing to his worsening health;

    v.    Enforcing policies that allowed staff to rely on mentally incapacitated detainees' refusals of medical treatment without considering their inability to make informed decisions or utilizing available legal guardians to provide necessary care;

    vi.    Maintaining inadequate procedures for monitoring and documenting the health of detainees placed in restrictive housing, resulting in Decedent's deteriorating physical and mental condition going unnoticed and untreated.

vii.    Failing to enforce policies IS-E-18 and IS-E-03, which require staff to complete health and well-being check forms and meal chart forms for detainees with special needs or those in restrictive housing. The lack of proper enforcement led to inadequate monitoring of Decedent's health and nutrition during his detainment, allowing his condition to deteriorate without appropriate intervention.

309.    Defendant Shawnee County is vicariously liable for the negligent acts, omissions, and commissions of their agents, employees, and medical staff committed within the nature and scope of their employment with Defendant Shawnee County.

310.    Defendants Armor Health of Shawnee County and Armor Health Management possessed supervisory responsibility for the policies and procedures in providing medical care which violated Decedent's constitutional right to receive proper and humane medical treatment while incarcerated at Shawnee County ADC.

311.    There is an affirmative link between the aforementioned acts and/or omissions of Defendant Armor in being deliberately indifferent to Decedent's serious medical needs, health and safety and policies, practices and/or customs which Armor promulgated, created, or implemented and/or possessed responsibility for.

312.    The policies and procedures of Defendant Armor which violated Decedent's constitutional right to receive proper and humane medical treatment include, but is not limited to, the following:

i.    Implementing a policy that allowed for delays in completing medical intake screenings for inmates with serious medical and mental health needs, resulting in Decedent going untreated for the duration of his detainment;

ii.    Failing to enforce the mandatory transfer of inmates exhibiting altered mental status or refusal to cooperate with intake screenings to the Emergency Department, as required by Armor's policy J-E-02(11)(d);

iii.  Maintaining policies that permitted staff to rely on mentally incapacitated inmates' refusals of medical treatment without considering their inability to make informed medical decisions;

iv.  Failing to implement procedures requiring staff to involve legal guardians in making medical decisions for inmates who were incapable of doing so themselves;

v.  Enforcing inadequate monitoring and documentation procedures for inmates in segregation, which resulted in Decedent's rapid deterioration going unnoticed and/or unaddressed.

313.  Defendant Armor is vicariously liable for the negligent acts, omissions, and commissions of their agents, employees, and medical staff committed within the nature and scope of their employment with Defendant Armor.

314.  Defendant Heather Willier, in her individual capacity as Shawnee County ADC's Health Services Liaison, Defendant Maggie Moore in her individual capacity as Armor's Health Services Administrator at Shawnee County ADC, and Defendant Emily Foster in her individual capacity as Armor's Behavioral Health Director at Shawnee County ADC possessed supervisory responsibility for the policies and procedures in providing medical care which violated Decedent's constitutional right to receive proper and humane medical treatment while detained at the Shawnee County ADC.

315.  As Shawnee County's Health Services Liaison, Defendant Heather Willier is responsible for acting as the intermediary between the medical provider, Armor and Shawnee County ADC staff.  In addition, it is her duty to ensure that jail staff are adequately informed, trained, and equipped to assess and respond to the medical and mental health needs of detainees when medical staff fail to do so.

316.  As Armor's Health Services Administrator, Defendant Maggie Moore, is responsible for overseeing the delivery of medical care within Shawnee County ADC, ensuring

72

compliance with applicable policies and standards, coordinating with jail staff to address detainees' medical needs, managing staff performance to provide timely and adequate care, and ensuring that staff are properly trained to recognize and respond to serious medical and mental health conditions.

317.    As Armor's Behavioral Health Director, Defendant Emily Foster is responsible for overseeing the delivery of mental health services within the facility, ensuring compliance with applicable policies and standards, coordinating with jail staff to address detainees' mental health needs, managing staff performance, and ensuring that staff are properly trained to recognize and respond to serious mental health crises.

318.    There is an affirmative link between the aforementioned acts and/or omissions of Defendants Willier, Moore, and Foster in being deliberately indifferent to Decedent's serious medical needs, health and safety and policies, practices and/or customs which they promulgated, created, implemented and/or possessed responsibility for.

319.    Such policies, practices and/or customs include, but are not limited to:

i.    Implementing policies that allowed for up to 14 days to conduct a mental health appraisal under IS-E-02, an unreasonably long delay for detainees like Decedent who were experiencing an acute mental health crisis;

ii.    Failing to enforce J-E-02(11)(d), which requires the immediate transfer of detainees with altered mental status to the Emergency Department, allowing Decedent's psychiatric and medical conditions to worsen without proper intervention;

iii.    Allowing staff to rely on mentally incapacitated detainees' refusals of medical treatment without ensuring the involvement of legal guardians who had authority to make medical decisions, leading to the denial of necessary care for Decedent;

iv.    Failing to ensure that health and well-being check forms and meal chart forms required under IS-E-18 and IS-E-03 were completed for Decedent, resulting in a lack of proper monitoring and oversight of his deteriorating condition;

v.   Failing to implement adequate procedures for monitoring and documenting the physical and mental health of detainees in restrictive housing, which led to Decedent's untreated conditions and eventual death.

**D. Deliberate Indifference to Decedent (Mack, Willier, Moore, Foster, Claflin, Siler, Gumbel, Cocke, Ritchie Addington)**

320.   Defendant Mariana Mack, M.D., directly and deliberately participated in denying Decedent medical treatment for his mania and/or psychosis, and other obviously serious medical conditions which were known to Defendant Mariana Mack, M.D.

321.   Defendant Mariana Mack, M.D., directly participated in deliberate indifference to the medical needs of Decedent, which included, but is not limited to, the following acts:

i.   Failing to order immediate and appropriate treatment for Decedent's acute mental health crisis, despite clear signs of mania and/or psychosis, allowing his mental condition to rapidly deteriorate during his time in custody;

ii.   Failing to transfer Decedent to the Emergency Department or a mental health facility, despite his obvious need for psychiatric evaluation and in-patient treatment due to his deteriorating mental state;

iii.   Delaying critical baseline lab work for Decedent by scheduling it for the end of the following week, despite his visibly worsening condition and urgent need for immediate evaluation;

iv.   Failing to ensure that Decedent's medical and mental health needs were addressed in a timely manner, resulting in a lack of urgent care for his rapidly declining physical and mental condition;

v.   Failing to utilize Decedent's legal guardian to authorize medical treatment when Decedent was unable to make informed decisions about his care, despite Decedent's clear incapacity to understand the consequences of refusing treatment;

vi.   Failing to properly monitor and document Decedent's deteriorating mental health condition, as required by medical standards for patients exhibiting signs of severe mental illness or psychosis;

vii.  Continuing to rely on Decedent's refusal to participate in treatment despite his clear incapacity to make informed decisions, allowing his mental and physical health to deteriorate unchecked;

viii.  Failing to contact or transfer Decedent to his treating Psychiatrist; and

ix.  Failing to identify and address Decedent's physical health conditions, such as history of cellulitis and swelling in his lower left leg, which went untreated during his detainment and contributed to his eventual death.

322.  Nurse Kimberly Claflin and Nurse Dawn Siler directly participated in deliberate indifference to the medical needs of Decedent, which included, but is not limited to, the following acts:

i.  Failing transfer Decedent to the Emergency Department or a mental health facility during the pre-booking screening when he was in a severely altered mental status and described him as either chemically impaired or having a mental illness;

ii.  Allowing Decedent to continue with the booking process when it was apparent to her that performing a medical screening on Decedent would pose a safety concern;

iii.  Failing to complete the medical screening on Decedent because of his behavior, and instead placing him on "screen pending status" and allowing him to be booked into the facility in violation of Armor and Shawnee County policy as addressed above; and

iv.  Denying Decedent access to medical personnel capable of evaluating his need for treatment and preventing Decedent from receiving necessary treatment.

323.  Sergeant Shannon Addington directly participated in deliberate indifference to the medical needs of Decedent, which included, but is not limited to, the following acts:

i.  Moving Decedent from the booking area to segregation despite knowing Decedent was suffering from an emergent mental health crisis;

ii.  Failing to call a physician or nurse practitioner or transfer Decedent to the Emergency Department when he deemed Decedent was unfit for the medical unit due to his behavior;

iii.   Failing to call a physician or nurse practitioner or transfer Decedent to the Emergency Department when Defendant Addington observed Decedent standing in his cell doorway, screaming and banging on the door and saw Decedent smearing his own feces over the walls of his cell and mattress; and

iv.   Denying Decedent access to medical personnel capable of evaluating his need for treatment and preventing Decedent from receiving necessary treatment.

324.   Nurse Heidi White directly participated in deliberate indifference to the medical needs of Decedent, which included, but is not limited to the following acts:

i.   Clearing Decedent for confinement in segregation when she knew, or it was obvious that, Decedent was suffering from an acute mental health crisis;

ii.   Failing to call a physician or nurse practitioner or transfer Decedent to the Emergency Department when Decedent was unfit to be admitted to the facility;

iii.   Failing to call a physician or nurse practitioner or transfer Decedent to the Emergency Department when Defendant White knew he was hyper and manic upon arrest and that he suffered from mental health issues and had spent time in a mental health facility in the past;

iv.   Inaccurately completed the Confinement Clearance form, as shown below, in which she disregarded significant information she knew about Decedent allowing him to be admitted into the facility; and

🔒Nursing - Confinement Clearance (PT-035)

MATTHEW COLE OLIVA
#2023-00007372

| | | | |
|---|---|---|---|
| Date/Time notified of confinement move | | | 10/22/2023 0716 |
| Name of security officer making notification | | Sgt Addington | |
| 1. Is the patient taking psychotropic medications? | | ◎ No | |
| 2. Is the patient going to confinement for behavior that could lead to additional criminal charges? Examples: Physical/sexual assault on staff or another inmate or dangerous contraband in facility, arson, theft, escape or kidnapping? | | ◎ No | Sgt. Addington called stating IM was not fit for medical. |
| 3. Has a prior history of self-harm attempts? | | ◎ No | Unknown |
| 4. Diagnosed with major mental illness such as schizophrenia, psychotic disorder, major depressive, bipolar or schizoaffective disorder? | | ◎ No | |
| 5. Is it reported or likely that the patient is intoxicated/under influence or withdrawing from drugs or alcohol?<br><br>Note: If Yes Contact HCP Immediately | | ◎ No | |
| If # 5 answer was "Yes", Time and Name of HCP that was notified. | | ◎ N/A | |
| 6. Has the patient been on any Behavioral Health monitoring status within 90 days? | | ◎ No | |
| 7. Is there a medical, mental health, or dental need that requires special accommodation (i.e. low bunk, inhaler on person, etc.) in confinement? | | ◎ N/A | |
| If #7 is "Yes", list actions taken for special accommodation. | | ◎ N/A | |
| 8. Is there a medical, mental health, or dental need that contraindicates the medical clearance for confinement?<br><br>If Yes, Immediate notification to appropriate HCP/MHP | | ◎ No | |
| If # 8 answer was "Yes", Time and Name of HCP/MHP that was notified. | | ◎ N/A | |
| If inmate not medically cleared, time shift supervisor notified | | ◎ N/A | |
| Name of shift supervisor notified | | ◎ N/A | |
| Medically Cleared for Confinement: | | ◎ Yes | |
| Notify Mental Health for Confinement: | | ◎ Yes | |
| General comments | | ◎ N/A | |

v.    Denying Decedent access to medical personnel capable of evaluating his need for treatment and preventing Decedent from receiving necessary treatment.

325.    Defendant Cameron (Cami) Cocke directly participated in deliberate indifference to the medical needs of Decedent, which included, but is not limited to the following acts:

i.    Failing to treat Decedent or seek immediate treatment from a qualified medical provider such as a psychiatrist, physician, or nurse practitioner or transfer Decedent to the Emergency Department, a mental health facility, or his treating Psychiatrist when she completed a Behavioral Health Intake Screening identifying him as actively manic and requiring an urgent referral to behavioral health; and

ii.    Failing to take any action to treat Decedent when she knew he was in an active mental health emergency; and

iii.    Failing to provide Decedent medication she knew he needed, that was being prescribed by his treating Psychiatrist and without he was a danger to himself and others; and

iv.    Denying Decedent access to medical personnel capable of evaluating his need for treatment and preventing Decedent from receiving necessary treatment.

326.    Defendant Cassandra Gumbel directly participated in deliberate indifference to the medical needs of Decedent, which included, but is not limited to the following acts:

i.    Failing to maintain consistent contact and referring refer him to a mental health facility or hospital despite having conversations with his mother and legal guardian, Ms. Branson, which revealed his severe mental health issues and need for treatment beyond the capabilities of Shawnee County ADC;

ii.    Failing to immediately refer Decedent to a mental health facility or hospital when she knew he was in a severely altered mental state; and

iii.    Denying Decedent access to medical personnel capable of evaluating his need for treatment and preventing Decedent from receiving necessary treatment.

327.    Defendants Heather Willier, Maggie Moore, and Emily Foster directly participated in deliberate indifference to the medical needs of Decedent, which included, but is not limited to the following acts:

i.    Continuously refusing to transfer Decedent to a mental health facility or hospital, despite his obvious need for immediate psychiatric and medical intervention;

ii.    Delaying critical care by insisting on completing a medical intake screening that had been unsuccessful since his detention on October 22, 2023, due to his mental state;

iii.    Failing to take instruction and information from Decedent's legal guardian, who had full authority to make medical decisions, and Decedent's treating Psychiatrist, who was prepared to facilitate treatment;

iv.    Denying Decedent access to medical personnel capable of evaluating his need for treatment and preventing Decedent from receiving necessary treatment; and

v.    Failing to fulfill their gatekeeping role and provide access to qualified medical personnel capable of evaluating and treating Decedent's condition when they were aware of severely altered mental state and deterioration.

328.    Defendants' acts and omissions in these respects resulted in an unnecessary delay in life-saving intervention and led to his death.

78

329.    No act or omission on the part of Decedent or the Plaintiffs caused or contributed to Decedent's resulting personal bodily injuries or any of his other resulting damages.

330.    All named Defendants' collective acts of directly participating in deliberate indifference to Decedent's medical needs and/or implementation of policies and procedures that denied Decedent's right to receive proper and humane medical treatment were in violation of clearly established constitutional rights under the Fourteenth Amendment.

331.    As a direct and proximate result of the conscious acts and/or maintained policies and procedures and fault of all named Defendants, Decedent, Matthew Oliva, was made to sustain and suffer injuries and damages, including but not limited to conscious pain, suffering, mental anguish, disability, loss of time, medical expenses and other damages prior to his death, and Plaintiff Jan Branson as the Administrator of the Estate of Decedent, Matthew Oliva, is entitled to recover for said damages pursuant to the provisions of 42 U.S.C. § 1983, all of which are in an amount in excess of $75,000 exclusive of interest and costs.

332.    As a direct and proximate result of the conscious acts and/or maintained policies and procedures and fault of all named Defendants which caused or contributed to the wrongful death of Decedent, Matthew Oliva, on November 17, 2023, Plaintiffs James Oliva, Jan Branson, and Bradford Oliva and other surviving heirs-at-law of Decedent, Matthew Oliva, have been made to sustain and suffer damages which include, but are not limited to, mental anguish, suffering, bereavement, loss of society, loss of comfort, loss of companionship, loss of services, loss of attention, loss of protection, funeral expenses, and all other elements of damage as permitted by K.S.A § 60-1901, *et. seq*., all of which are in an amount in excess of $75,000, exclusive of interest and costs.

333.    Due to the named Defendants' reckless and callous disregard of the constitutional rights of Decedent, Matthew Oliva, in denying necessary medical care while he continued to gradually deteriorate from his mania and/or psychosis, and other obviously serious medical conditions, Plaintiffs are entitled to punitive damages under 42 U.S.C. § 1983.

334.    Plaintiffs are entitled to their reasonable attorney fees, costs, and expenses from all named Defendants as provided by 42 U.S.C. § 1983.

335.    Plaintiffs are entitled to judgment against these Defendants in an amount in excess of $75,000.00 exclusive of interest and costs.

**<u>COUNT II</u>**
**Pendant State Claims Under 28 U.S.C. § 1367**

**MEDICAL NEGLIGENCE/WRONGFUL DEATH vs. DEFENDANTS ARMOR HEALTH OF SHAWNEE COUNTY, ARMOR HEALTH MANAGEMENT, MARIANA MACK, M.D., MOORE, FOSTER, CLAFLIN, SILER, GUMBEL, COCKE, AND RITCHIE**

336.    Plaintiffs adopt and incorporate by reference all allegations contained in the above paragraphs as if fully set forth herein.

337.    Defendant Armor, by and through their agents, employees, and medical staff, had a duty to provide medical care and treatment to Decedent, Matthew Oliva, within the acceptable standards of care.

338.    The medical care and treatment rendered to Decedent by and through the agents, employees, and medical staff of Defendant Armor fell below the acceptable standards of care and constitute negligence and fault on the part of the agents, employees, and medical staff of Defendant Armor. These deviations from the acceptable standard of medical care and treatment include but are not limited to:

   i.   Failing to timely and properly assess and diagnose Decedent's severe mental and medical health conditions and provide appropriate medical and psychiatric care;

    ii.    Failing to follow established protocols, such as transferring Decedent to the Emergency Department under J-E-02 when he exhibited signs of altered mental status and refused medical screening;

    iii.    Continuing to rely on Decedent's refusal of medical treatment despite his clear mental incapacity to make informed decisions about his care, and failing to involve his legal guardian, who had full authority to provide consent for necessary medical treatment;

    iv.    Failing to seek or obtain authorization from Decedent's legal guardian, despite Decedent's inability to make informed decisions, which caused unnecessary delays in providing him with critical medical care;

    v.    Failing to conduct baseline lab work in a timely manner, delaying critical evaluations necessary for Decedent's diagnosis and treatment despite his visibly deteriorating condition.

339.    Defendant Armor is vicariously liable for negligent acts, omissions, and commissions of their agents, employees, and medical staff committed within the nature and scope of their employment.

340.    The medical care, diagnosis, evaluation, and treatment provided by Defendant Mariana Mack, M.D., fell below the acceptable standard of medical care and treatment and constituted negligence and fault on the part of this Defendant.

341.    The departures from the acceptable standard of medical care and treatment on the part of Mariana Mack, M.D., include but are not limited to:

    i.    Failing to evaluate Decedent in a timely manner, waiting until November 3, 2023, 12 days after his arrival, despite Decedent presenting in an emergent mental health crisis upon admission to the Shawnee County ADC;

    ii.    Failing to provide prompt and appropriate psychiatric care for Decedent, whose condition rapidly deteriorated due to the lack of timely intervention and treatment;

    iii.    Delaying critical baseline lab work and necessary medical evaluations, despite Decedent's worsening condition, and scheduling the labs for a later date instead of addressing his immediate health needs;

iv.   Failing to diagnose and address Decedent's severe mental health crisis and physical symptoms, including his altered mental status, which required immediate intervention according to standard medical practices;

v.    Relying on Decedent's refusal of treatment despite his clear incapacity to make informed medical decisions, rather than involving his legal guardian to authorize necessary care;

vi.   Failing to take appropriate action to transfer Decedent to the Emergency Department or a mental health facility when he exhibited clear signs of psychiatric and medical emergencies.

342.   The medical care, diagnosis, evaluation, and treatment provided by Defendants Moore, Foster, Claflin, Siler, Gumbel, Cocke, and Ritche, fell below the acceptable standard of medical care and treatment and constituted negligence and fault on the part of these Defendants.

343.   As more specifically set out above, Defendants Moore, Foster, Claflin, Siler, Gumbel, Cocke, and Ritchie were negligent in that said Defendants failed and refused to order immediate hospitalization in light of a life threatening, serious medical need.

344.   No act or omission on the part of Decedent or the Plaintiffs caused or contributed to Decedent's resulting personal bodily injuries or any of his other resulting damages.

345.   As a result of the separate and/or combined negligence and fault of Defendants Armor, Mack, Moore, Foster, Claflin, Siler, Gumbel, Cocke, and Ritchie, Decedent was made to suffer injuries and damages, including but not limited to conscious pain, suffering, mental anguish, disability, loss of time and income, medical expenses and other damages prior to his death, and Plaintiff Jan Branson as Administrator of the Estate of Matthew Oliva, deceased, is entitled to recover for said damages pursuant to the provisions of K.S.A. § 60-180, *et. seq*.

346.   As a result of the separate and/or combined negligence and fault of Defendants Armor, Mack, Moore, Foster, Claflin, Siler, Gumbel, Cocke, and Ritchie which caused or

contributed to cause the wrongful death of Decedent, Matthew Oliva, on November 17, 2023, Plaintiffs Jim Oliva, Jan Branson, and Bradford Oliva and other surviving heirs-at-law of Decedent, Matthew Oliva, have been made to sustain and suffer damages which include, but are not limited to mental anguish, suffering, bereavement, loss of society, loss of comfort, loss of companionship, loss of services, loss of attention, loss of protection, funeral expenses, and all other elements of damage as permitted by K.S.A § 60-1901, *et. seq*.

347. Plaintiffs are entitled to judgment against these Defendants in an amount in excess of $75,000.00 exclusive of interests and costs.

WHEREFORE, Plaintiffs request that the Court, after a trial by jury of their claims, enter judgment against Defendants for their actual damages, nominal damages, and punitive or exemplary damages as are proven at trial, for their attorney fees and expenses pursuant to 42 U.S.C. 1988 for costs herein, interest, and for any such further legal and equitable relief as the Court deems appropriate.

## COUNT III

### ALTER EGO LIABILITY vs. ARMOR DEFENDANTS

348. Plaintiffs adopt and incorporate by reference all allegations contained in the above paragraphs as if fully set forth herein.

349. There are sufficient grounds to disregard the legal fiction of corporate separateness and treat Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, Armor Correctional Healthcare Holdings, Otto Campo, and Jose Armas ("Armor Defendants") as alter egos of one another.

350. The Armor Defendants are under common control and ownership, act in concert, and are not fully distinct or independent from one another. Armor Health of Shawnee County is

influenced and governed by Armor Health Management, Otto Campo and Dr. Armas, who also own and control Armor Health Holdings and Armor Correctional Healthcare Holdings.

351. The Armor Individuals use their own funds, the funds of Armor Holding Companies, and the funds of other Armor Entities to pay each other's debts and obligations, as needed.

352. The Armor Defendants use their corporate identities and funds interchangeably and to support each other.

353. The Armor Defendants use one another as instruments to conduct personal business.

354. The Armor Defendants do not bargain at arm's length with one another.

355. Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, and Armor Correctional Healthcare Holdings operate with overlapping management, control, and ownership, further demonstrating the lack of independence among Armor Defendants.

356. The Armor Defendants commingle their funds in bank accounts and do not always segregate their funds, operating systems, management, or internal structure. According to a recent balance sheet from Armor Correctional Healthcare Services, Inc., (n/k/a Armor Health Management), as of October 31, 2024, significant intercompany receivables and payables demonstrate a pattern of funds being transferred among the Armor Defendants without clear segregation.

357. As of October 31, 2024, Armor Health Management was owed $1,714,293.47 by Armor Health of Shawnee County, indicating that substantial funds from Shawnee County are funneled to Armor Health Management, likely through a back-office management agreement that facilitates the transfer of operational revenues.

358.   Armor Health Management then transfers millions of dollars to the holding companies, Armor Health Holdings and Armor Correctional Healthcare Holdings. The balance sheet reflects an intercompany receivable of $61,099,194.72 due to Armor Correctional Healthcare Holding from Armor Health Management, an intercompany payable of $109,540,035.82 from Armor Health Management to Armor Correctional Healthcare Holding, and an additional $465,105.18 due from Armor Health Management to Armor Health Holdings.

359.   These funds are then distributed to Otto Campo and Jose Armas as financial beneficiaries of Armor Health Holdings and Armor Correctional Healthcare Holdings. The balance sheet shows significant shareholder distributions, including $2,405,000.00 in amounts due to shareholders and dividends paid totaling $15,908,560.73. These distributions indicate that Otto Campo and Jose Armas extract substantial funds from the holding companies for personal benefit, further evidencing the lack of corporate separateness.

360.   Armor Correctional Healthcare Holdings, Inc., is one of two Class A Members of Armor Health Holdings, LLC, with a 99.50% interest in the Class A shares and a 49.75% Profits Interest in Armor Health Holdings.

361.   Jose Armas is the second Class A Member of Armor Health Holdings with a 0.50% percentage interest in Class A shares, and a 0.25% Profits Interest in Armor Health Holdings, LLC.

362.   Otto Campo serves as the Manager and CEO of Armor Health Holdings and is the sole Class B Member of Armor Health Holdings, with a 50% Profits Interest in Armor Health Holdings. Otto Campo also serves as the President and Director of Armor Correctional Healthcare Holdings, Inc., the entity which owns 99.5% of Armor Health Holdings, LLC.

363.   Otto Campo and Dr. Armas as the members and/or managers of the Armor Defendants, exercise control over these fund transfers and distributions, using the corporate

structure to shield personal assets while siphoning funds through dividends and shareholder payments, as evidenced by the $2,405,000.00 due to shareholders and the $15,908,560.73 in dividends paid, which directly benefit them personally.

364.    The financial structure and practices of the Armor Defendants demonstrate a unity of interest and ownership such that adherence to the fiction of separate corporate existence would promote injustice and allow Armor Health Holdings, Armor Correctional Healthcare Holdings, Otto Campo and Jose Armas to evade liability for the obligations of Armor Health of Shawnee County.

365.    Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, and Armor Correctional Healthcare Holdings are used interchangeably by Campo and Armas to receive payments, satisfy debts, and manage each other.

366.    Armor Health of Shawnee County was created solely to contract with Shawnee County ADC and siphon funds to Armor Health Management, Armor Health Holdings, Armor Correctional Healthcare Holdings. Armor Health of Shawnee County has no distinct corporate identity and in its own, is of little value outside of the contract with Shawnee County ADC.

367.    Armor Health of Shawnee County operates as a shell entity, primarily existing to facilitate the transfer of funds from Shawnee County ADC to Armor Health Management, Armor Health Holdings, Armor Correctional Healthcare Holdings, and ultimately to Campo and Armas. Armor Health of Shawnee County is systematically structured to have minimal assets, rendering it unable to satisfy any judgment against it.

368.    The Armor Defendants' bad faith in transferring funds and assets among themselves makes it inequitable for them to hide behind the corporate veil. Allowing Armor Health Holdings, the named insured on the insurance policy which Armor Defendants state covers this claim, to hide

behind the corporate veil and not satisfy any potential judgment against Armor Health of Shawnee County, would promote an injustice to Plaintiffs.

369.    The Armor Defendants' financial practices, including the commingling of funds and the transfer of substantial sums to individual owners, are designed to shield assets from creditors and plaintiffs.

370.    Otto Campo, Jose Armas, and the Armor Holding Companies should be held jointly and severally liable for the acts of Armor Health of Shawnee County and Armor Health Management, and for any judgment awarded against any of the Armor Defendants.

371.    Thus, this Court should disregard the separate corporate entities of Armor Health of Shawnee County, Armor Health Management, Armor Health Holdings, Armor Correctional Healthcare Holdings, Otto Campo, and Jose Armas and enter any judgment herein against all named Armor Defendants in joint and several liability, and for further relief as the Court may deem just and equitable.

WHEREFORE, Plaintiffs request that the Court, disregard the separate corporate entities of Jose Armas, Otto Campo, Armor Health Holdings, Armor Correctional Healthcare Holdings, Armor Health Management, and Armor Health of Shawnee County after a trial by jury of their claims, enter judgment against Defendants in joint and several liability for their actual damages, nominal damages, and punitive or exemplary damages as are proven at trial, for their attorney fees and expenses pursuant to 42 U.S.C. 1988 for costs herein, interest, and for any such further legal and equitable relief as the Court deems appropriate.

## COUNT IV

**SUCCESSOR LIABILITY vs. DEFENDANT ENHANCED MANAGEMENT SERVICES**

372.    Plaintiffs adopt and incorporate by reference all allegations contained in the above paragraphs as if fully set forth herein.

373.    Plaintiffs became creditors of Armor Health Management, LLC when their claims arose following the death of Decedent, due to the inadequate medical care provided by Armor Health Management and Armor Health of Shawnee County.

374.    On October 11, 2023, a Petition Commencing Assignment for the Benefit of Creditors of the Estate of Armor Health Management, LLC, was filed in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. The Assignment Proceedings arose from AHM's overwhelming unsecured debt, exceeding $150 million, largely due to pending lawsuits and unpaid obligations.

375.    On February 27, 2025, the Court in the Assignment Proceedings approved the sale of Armor Health Management's assets to Defendant Enhanced Management Services, LLC ("EMS").

376.    EMS, formed on August 29, 2023, is wholly owned by Defendant Dr. Jose Armas, who is also the owner of Armor Health Holdings, LLC, Armor Correctional Healthcare Holdings, Inc., Armor Health Management, LLC, and Armor Health of Shawnee County, LLC.

377.    Manuel Fernandez serves as the Manager of EMS, while simultaneously serving as Chief Operating Officer (COO) of Armor Health. Fernandez signed the Health Services Agreement between Armor Health of Shawnee County and the Shawnee County Department of Corrections, evidencing continuity of management and operations between the Armor entities and EMS.

378.     EMS assumed numerous "Special Purpose Entities" ("SPEs") as part of the approved asset sale. The SPEs, including Armor Health of Shawnee County, exist solely for the purpose of contracting with correctional institutions and governmental entities. EMS assumed both the assets and liabilities of these SPEs, including the contractual liabilities related to Armor Health of Shawnee County's agreement with Shawnee County.

379.     EMS now contracts directly with Armor Health of Shawnee County and other Armor subsidiaries to provide comprehensive managerial and operational support. EMS performs the same functions previously executed by Armor Health Management, including, but not limited to, providing policies and procedures, payroll services, accounting, finance, human resources, vendor agreements, risk management, compliance oversight, and administrative support.

380.     EMS operates from the same physical location (4960 SW 72nd Ave., Miami, Florida 63155), uses the same executives, officers, and management team, employs identical administrative and operational policies, and utilizes the same equipment and systems as Armor Health Management did prior to the Assignment Proceedings.

381.     From an operational standpoint, the only material change between Armor Health Management and EMS is the name of the business entity. EMS is merely a continuation of the Armor Health Management enterprise, operating with identical management, ownership, employees, procedures, and objectives.

382.     The transfer of assets from Armor Health Management to EMS occurred after Plaintiffs' claims arose, and no adequate consideration was exchanged to satisfy Armor Health Management's debts or obligations, leaving Armor Health Management essentially insolvent and unable to fulfill its financial and legal responsibilities.

383.    Jose Armas and the Armor entities intentionally orchestrated the transfer of Armor Health Management's assets to EMS to hinder, delay, or defraud creditors, including Plaintiffs, and to shield assets from potential judgments arising from ongoing litigation and liabilities.

384.    Alternatively, even if the transfers were not intentionally fraudulent, EMS is still liable under the theory of successor liability because EMS is merely a continuation of Armor Health Management's healthcare management business.

385.    The actions of EMS and the Armor Defendants in restructuring their business to EMS constitutes a merger or consolidation of the Armor entities, designed to evade obligations owed to creditors, including Plaintiffs.

386.    Adherence to the separate corporate existence between EMS, Armor Health Management, and the Armor entities would promote injustice, allowing EMS and the Armor Defendants to avoid satisfying liabilities legitimately owed to Plaintiffs.

387.    EMS is therefore liable as a successor entity for the debts, obligations, liabilities, and claims asserted against Armor Health Management, LLC and Armor Health of Shawnee County, LLC in this action.

WHEREFORE, Plaintiffs request that the Court, disregard the separate corporate entities of Enhanced Management Services, Armor Health Management, and Armor Health of Shawnee County after a trial by jury of their claims, enter judgment against Defendants in joint and several liability for their actual damages, nominal damages, and punitive or exemplary damages as are proven at trial, for their attorney fees and expenses pursuant to 42 U.S.C. 1988 for costs herein, interest, and for any such further legal and equitable relief as the Court deems appropriate.

## COUNT V[7]

### Negligence vs. Defendants Board of Shawnee County Commissioners, Willier, and Addington

388.    Plaintiffs adopt and incorporate by reference all allegations contained in the above paragraphs as if fully set forth herein.

389.    Defendants had a duty to take reasonable action to provide Decedent appropriate medical treatment and to protect Decedent against the risk of self-inflicted physical harm.

390.    Defendants had a duty to exercise reasonable care under the circumstances to prevent Decedent from an unreasonable risk of physical harm.

391.    Defendants had a duty to exercise reasonable care in evaluating, conducting due diligence, and selecting an adequate third-party medical provider to provide mental and physical healthcare services for detainees at the Shawnee County ADC.

392.    Defendants were negligent in the care, custody and control of Decedent in that they failed to properly arrest and detain Decedent when they knew he was in a state of psychosis and mental and physical decline and failed to have Decedent evaluated and properly treated for his medical condition.

393.    Defendants were negligent in that they failed to reasonably evaluate, conduct due diligence, and select an adequate third-party medical provider. Specifically, Defendants failed to conduct reasonable due diligence which would have revealed Armor Health Management was subject to hundreds of pending lawsuits for inadequate medical care, Armor Health Management

---

[7] Plaintiffs hereby bring a state law negligence claim against the Shawnee County Defendants. Plaintiffs believe this claim meets the notice provision under KSA 12-105b, as Plaintiffs' Original Complaint constitutes adequate notice under KSA 12-105b. Out of an abundance of caution, Plaintiffs served a formal Notice of Action to the County Clerk on May 30, 2025. If Plaintiffs' Original Complaint is not deemed adequate notice, Plaintiffs will seek leave to amend to add this negligence claim after receiving a formal denial of the claim from the County, or 120 days passes, whichever is first.

was convicted of a corporate felony for falsifying medical records at a correctional facility, and Armor Health Management was undergoing a significant corporate restructuring intended to shield its assets from any pending lawsuits and/or other liabilities.

394.    Defendants' negligence caused Decedent to suffer great injury and death.

395.    Defendants' actions directly and proximately caused Decedent to suffer physical and emotional pain, mental distress, conscious pain and suffering and after a period of time, death.

396.    As a result of Defendants' actions which caused or contributed to cause the wrongful death of Decedent, Matthew Oliva, on November 17, 2023, Plaintiffs Jim Oliva, Jan Branson, and Bradford Oliva and other surviving heirs-at-law of Decedent, Matthew Oliva, have been made to sustain and suffer damages which include, but are not limited to mental anguish, suffering, bereavement, loss of society, loss of comfort, loss of companionship, loss of services, loss of attention, loss of protection, funeral expenses, and all other elements of damage as permitted by K.S.A § 60-1901, *et. seq.*

397.    Plaintiffs are entitled to judgment against these Defendants in an amount in excess of $75,000.00 exclusive of interests and costs.

WHEREFORE, Plaintiffs request that the Court, after a trial by jury of their claims, enter judgment against Defendants for their actual damages, nominal damages, and punitive or exemplary damages as are proven at trial, for their attorney fees and expenses pursuant to 42 U.S.C. 1998 for costs herein, interest, and for any such further legal and equitable relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues raised herein.

Respectfully Submitted by:

**PREUSS | FOSTER**
*/s/   Thomas J. Preuss*
Thomas J. Preuss, KS 21431
Shawn G. Foster, KS 19090
Andrew R. Clark, *Pro Hac Vice*
11141 Overbrook Road, Suite 104
Leawood, KS 66211
Ph. 816-307-2788
Fax 816-336-9705
Email: tjpreuss@pflaw.com
          sfoster@pflaw.com
          aclark@pflaw.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of August, 2025, the above and foregoing document was transmitted via the Pacer Court Filing System to all parties of records.

*/s/ Thomas J. Preuss*